Manuel Diaz ARTEAGA, Petitioner,

v.

IMMIGRATION AND NATURALIZA-
TION SERVICE, Respondent.

No. 86–7124.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 9, 1987.

Decided Jan. 13, 1988.
As Amended April 6, 1988.

A. Araceli Ramirez, Pittsburg, Cal., for
petitioner.

Eileen A. Carty, (INS), Washington, D.C.,
for respondent.

Before GOODWIN and FLETCHER, Circuit Judges, and KING,* Senior District Judge.

FLETCHER, Circuit Judge:

Petitioner Manuel Diaz Arteaga is a 24 year old native and citizen of El Salvador. At a deportation hearing in December 1984, Arteaga admitted that he had entered the United States without inspection in February 1984, in violation of 8 U.S.C. § 1251(a)(2). He conceded deportability and applied for political asylum in the United States.[1]

At his deportation hearing, Arteaga testified about several different incidents.[2] The focal point of Arteaga's claim of persecution is a visit a group of guerrillas paid to him at his house in August 1983. The guerrilla members, former friends of Arteaga, tried to get him to join them in the civil war against the government. When Arteaga refused, stating his intention to remain neutral, the guerrillas said to him: "Even if you don't come, we'll get you." Allegedly put in fear by this threat, Arteaga left his mother and nine sisters and came to the United States.

The immigration judge issued an oral decision denying withholding of deportation and asylum, and granted Arteaga thirty days in which to depart voluntarily. According to the immigration judge, the guerrillas "did not attempt to take him [into] custody or force him into the guerrilla movement," but instead "tried to persuade him to voluntarily join the guerrillas." The Board of Immigration Appeals (BIA, or Board) affirmed the decision of the immigration judge.

## DISCUSSION

■ This court has jurisdiction to review the BIA's decision pursuant to Section 242(a) of the Immigration and Nationality Act, 8 U.S.C. § 1252(a). The factual findings underlying the BIA's decisions on granting or denying asylum and withholding of deportation are reviewed under the "substantial evidence" test. *McMullen v. INS*, 658 F.2d 1312 (9th Cir.1981). Questions of law, such as whether the BIA applied the appropriate legal standard, are reviewed *de novo*. *Florez–De Solis v. INS*, 796 F.2d 330, 333 (9th Cir.1986).

### I. *Asylum and Withholding Standards*

Because Arteaga conceded deportability, the government's burden is satisfied, and Arteaga must show entitlement to relief from deportation. *Estrada v. INS*, 775 F.2d 1018, 1020 (9th Cir.1985). Arteaga contends that the BIA's decision failed to distinguish the legal standards for withholding of deportation under § 243(h) and political asylum under § 208(a). Arteaga is entitled to mandatory withholding of deportation if his "life or freedom would be threatened in [El Salvador] on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1253(h)(1). In *INS v. Stevic*, 467 U.S. 407, 430, 104 S.Ct. 2489, 2501, 81 L.Ed.2d 321 (1984), the Supreme Court held that "the 'clear probability of persecution' standard remains applicable to § 243(h) withholding of deportation claims." The Court explained that under the clear probability standard "[t]he question ... is whether it is more likely than

---

* Honorable Samuel P. King, Senior United States District Judge, District of Hawaii, sitting by designation.

1. Jurisdiction over a request for asylum that is made after the institution of deportation proceedings lies with the immigration judge. 8 C.F.R. § 208.1 (1987). Such a request is also considered an application for withholding of deportation. 8 C.F.R. § 208.3(b) (1987).

2. In at least two instances, antigovernment guerrillas came to schools Arteaga was attending in order to recruit students and distribute propaganda. Arteaga also testified that his aunt and uncle had been driven out of the country by guerrillas several years before Arteaga left; that a national guardsman had come into Arteaga's mother's home and smashed her stove; that Arteaga had once attended an antigovernment demonstration; and that he had been put off a bus by guerrillas.

not that the alien [will] be subject to persecution." *Id.* at 424, 104 S.Ct. at 2498.

Arteaga qualifies for a discretionary grant of asylum if he shows a "well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion...." 8 U.S.C. §§ 1101(a)(42), 1158(a). The well-founded fear standard "play[s] no part" in the decision whether to withhold deportation, *INS v. Cardoza–Fonseca,* — U.S. ——, 107 S.Ct. 1207, 1212, 94 L.Ed.2d 434 (1987), and "is in fact 'more generous' than the clear-probability test." *Bolanos–Hernandez v. INS,* 767 F.2d 1277, 1282 (9th Cir.1984). *See Hernandez–Ortiz v. INS,* 777 F.2d 509, 514 (9th Cir.1985); *Sarvia–Quintanilla v. INS,* 767 F.2d 1387, 1393 (9th Cir.1985). In *Cardoza–Fonseca,* the Supreme Court concluded:

> Our analysis of the plain language of the Act, its symmetry with the United Nations Protocol, and its legislative history, lead inexorably to the conclusion that to show a "well-founded fear of persecution," an alien need not prove that it is more likely than not that he or she will be persecuted in his or her home country.

107 S.Ct. at 1222. The Court pointed out that "[o]ne can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place." *Id.* at 1213. The Court explained this by citing a hypothetical example in which a one-in-ten possibility of persecution would give rise to a "well-founded fear." *Id.*

This court has said that "our case law quite clearly establishes that the legal difference between 'clear probability' and 'well-founded fear' must be respected." *Rebollo–Jovel v. INS,* 794 F.2d 441, 444 (9th Cir.1986). Accordingly, the BIA decision should make it apparent that the Board "appreciated the necessity of applying separate and discrete standards." *Vides–Vides v. INS,* 783 F.2d 1463, 1468 (9th Cir.1986).

The BIA has frequently resorted to catchall statements in its asylum decisions that a given petitioner has failed to meet the asylum standard "regardless of wheth-er [petitioner's] claim is assessed in terms of demonstrating a 'clear probability,' a 'realistic likelihood,' a 'reasonable possibility,' or a 'good' or 'valid reason to fear' persecution." *Corado Rodriguez v. INS,* No. 85–7417, slip op. at 3267 (9th Cir. Mar. 14, 1988); *see Vides–Vides,* 783 F.2d at 1468; *Rebollo–Jovel,* 794 F.2d at 446; *Cardoza–Fonseca,* 767 F.2d 1448, 1450 (9th Cir.1985). Such a catchall analysis may fail to make clear that the BIA properly applied the discrete standards to withholding and asylum relief, respectively, particularly where the BIA makes reference to its decision in *Matter of Acosta,* Interim Dec. No. 2986 (BIA 1985). In *Acosta,* the BIA declared:

> It has been our position that as a practical matter the showing contemplated by the phrase "a well-founded fear" of persecution converges with the showing described by the phrase "a clear probability" of persecution.... Accordingly, we have not found a significant difference between the showings required for asylum and withholding of deportation.

*Acosta,* slip op. at 2 (citations omitted).

In *Vides–Vides, supra,* this court held that a BIA decision that "fails to state explicitly" that the asylum standard is "more generous" than the withholding standard is nevertheless sufficient if it, "read as a whole, reflects its recognition" of the distinctive standards. 783 F.2d at 1468. Significantly, *Vides–Vides* considered a BIA decision rendered prior to *Acosta,* and the court specifically left open the question of whether boiler-plate analysis was sufficient in post-*Acosta* cases: "In light of *Acosta,* it may be appropriate henceforth to require a more explicit statement from the BIA that, even were it to apply a more generous standard such as required in this circuit, it would still deny the asylum petition." 783 F.2d at 1468 n. 3.

This question was recently resolved in *Corado Rodriguez v. INS, supra,* which held that in post-*Acosta* cases the Board must be explicit that it is applying the more generous standard to the asylum claim. Slip op. at 3268–69. In *Corado Rodriguez,* the BIA had held that the petitioner's asylum

claim failed "regardless of whether her claim is assessed in terms of demonstrating a 'clear probability,' a 'realistic likelihood,' a 'reasonable possibility,' or a 'good' or 'valid reason to fear' persecution." *Id.* The court held that this "catchall" language failed to show that the Board had properly applied the "well-founded fear" standard, particularly where the Board reiterated its *Acosta* position and analyzed "well-founded fear" using terms used by the Ninth Circuit to define the stricter "clear probability" test. Id. at 3270.

Our analysis of this issue must also be guided by the decision in *Sanchez–Trujillo v. INS*, 801 F.2d 1571 (9th Cir.1986). There, the court held that a post-*Acosta* decision by the BIA had adequately applied the "well-founded fear" standard. The BIA had "inartfully" chosen to make occasional use of the words "would be" or "will be" in its evaluation of the asylum claim, arguably suggesting that it had applied the stricter standard.[3] However, the court found that the doubt raised by the "occasional use of the words 'would be' or 'will be' " was sufficiently clarified by the BIA's lengthy quotation from *Cardoza–Fonseca,* 767 F.2d 1448, together with an explicit statement that it was bound by Ninth Circuit precedent.

The BIA's decision in the instant case states that Ninth Circuit precedent controls,[4] quotes from *Cardoza–Fonseca,* and holds that the petitioner "has not shown a clear probability of persecution under section 243(h) or a well-founded fear of persecution under section 208(a), as that standard is described in *Cardoza–Fonseca v. INS....*" This aspect of the BIA opinion resembles *Sanchez–Trujillo.* However, in the instant case the BIA also states that "the Board's analysis of [the well-founded

fear standard] is set forth in *Matter of* Acosta." *See Corado Rodriguez,* slip op. at 3269 (BIA reiterated its position advanced in *Acosta*). By contrast, there is no indication in *Sanchez–Trujillo* that the Board there had cited *Acosta* as an authority.

Moreover, the BIA opinion scrutinized in *Sanchez–Trujillo* made it apparent that the "inartfully chosen" words, when read in context, "merely stat[ed] that an objective basis must be shown for a well-founded fear." 801 F.2d at 1579. If that is the case, the challenged language did not amount to a misapplication of the law. In the instant case, it cannot be said that the inartfully chosen words were subsumed under an essentially correct statement of the law. Instead, the BIA stated that Arteaga "failed to demonstrate that he as an individual would be singled-out and targeted for persecution" and bolstered this statement with citations to cases expounding or applying the "clear probability" standard. *See INS v. Stevic, supra; Rejaie v. INS,* 691 F.2d 139 (3d Cir.1982) (equating "clear probability" with "well-founded fear"); *Matter of Acosta, supra.*[5] The BIA continued its legal analysis by stating that "there is no evidence that the respondent was ever persecuted or which suggests the *likelihood* that he will be if returned to El Salvador." (Emphasis added). The word "likelihood," too, indicates that the BIA was applying the stricter standard. Nowhere in the BIA's legal analysis of the particular facts does it employ language indicative of the "more generous" well-founded fear test.

The instant case is distinguished from *Corado Rodriguez* by only two elements. First, the BIA did not use the particular boiler-plate language cited in *Corado Rod-*

---

3. For example, the BIA stated that the petitioners had "not shown any special, individualized circumstances indicating that they have been *or will be* singled out for persecution." 801 F.2d at 1579 (emphasis added). This language is indicative of the "clear probability" standard, which requires a showing of a "likelihood" of future persecution. *See Bolanos–Hernandez,* 767 F.2d at 1284.

4. The BIA decision was rendered before the Supreme Court's *Cardoza–Fonseca* decision.

5. The BIA also cited *Moghanian v. U.S. Dept. of Justice,* 577 F.2d 141 (9th Cir.1978). That case was decided before the adoption of the Refugee Act of 1980, and has little, if any, applicability to the asylum standard under § 208(a). *See* Refugee Act of 1980, Pub.L. No. 96–212, 94 Stat. 102 (1980), amending Immigration and Nationality Act, 8 U.S.C. §§ 1101 *et seq.*

*riguez.* Second, the BIA cited and quoted from *Cardoza–Fonseca* and alluded to the "well-founded fear" standard. However, this court must "address questions relating to the standard applied [by the BIA] on a case-by-case basis, deciding each not on the basis of 'certain magic words,' but on the basis of what the Board actually did." *Corado Rodriguez,* slip op. at 3269, quoting *Rebollo–Jovel v. INS,* 794 F.2d at 444. Thus, the boiler-plate statement employed by the BIA should not control, if it appears that the appropriate legal standard has not been applied but merely invoked as so many "magic words."

■ Here, the citation to controlling Ninth Circuit authority is set forth as black letter, but is framed by two citations to *Acosta* and a citation to a Third Circuit case squarely in conflict with *Cardoza–Fonseca. See Rejaie v. INS, supra.* In applying the facts to the law, the BIA decision uses language suggesting that the "clear probability" standard was applied. Notwithstanding its lip service to *Cardoza–Fonseca,* the BIA decision here fails to make explicit that the more generous standard was applied to the asylum claim. *Corado Rodriguez,* slip op. at 3269–70. We conclude that the case should be remanded to the BIA to enable it explicitly to apply the more generous well-founded fear standard. *See id.* at 3268–69.

## II. *Eligibility for Asylum*

■ Under a proper application of the "well-founded fear" standard, the BIA's finding that Arteaga is ineligible for asylum appears to be unsupported by substantial evidence.[6]

The record shows, and the BIA found, that in August 1983 Arteaga was asked by members of the guerrillas to join them in their war effort against the government of El Salvador. Arteaga testified that he left El Salvador in January 1984 out of fear that the guerrillas would "take" him. In particular, Arteaga testified that he was visited at his house by guerrillas who knew him because they were former friends of his, and that they told him "even if you don't come, we'll get you." The clear implication of this statement is a threat from the guerrillas that they would at some point return and forcibly conscript Arteaga if he did not join them voluntarily. Arteaga's testimony thus indicates that he had received a specific threat of conscription or kidnapping.[7] Because Arteaga has testified to a subjective fear, the remaining question is whether this one-time threat of conscription can give rise to a well-founded fear of persecution.

■ The term "persecution" in section 208(a) encompasses "the infliction of suffering or harm upon those who differ [on the enumerated grounds of race, religion, nationality, membership in a particular social group, or political opinion] in a way regarded as offensive." *Cardoza–Fonseca v. INS,* 767 F.2d 1448, 1452 (9th Cir.1985), *aff'd* — U.S. ——, 107 S.Ct. 1207, 94 L.Ed. 2d 434 (1987). The threat of persecution need not come from the government, but may also come from groups, including anti-government guerrillas, which the government is "unwilling or unable to control." *McMullen v. INS,* 658 F.2d 1312, 1315 & n. 2 (9th Cir.1981).

Arteaga was threatened with kidnapping or conscription by the guerrillas if he did not agree to join them voluntarily. Arteaga's resistance to joining them voluntarily, which prompted the threat, reflected his non-support for the guerrilla cause and his adoption of a neutral position towards both sides in the Salvadoran civil war. The choice to remain neutral constitutes a political opinion. *Bolanos–Hernandez,* 767 F.2d at 1286–87. Because Arteaga's neu-

---

6. The BIA concluded that Arteaga has not shown that it is "more likely than not" that he would be subject to persecution and is therefore not entitled to withholding of deportation under § 243(h). This conclusion seems to be supported by substantial evidence. *See, e.g., Garcia-Ramos v. INS,* 775 F.2d 1370, 1373 (9th Cir.1985).

7. Where, as here, the Board and the immigration judge make no findings as to the credibility of the petitioner's hearing testimony, the reviewing court must presume that the testimony was credible. *Platero-Cortez v. INS,* 804 F.2d 1127, 1131 (9th Cir.1986).

tral political opinion precluded his voluntarily joining the guerrillas, the guerrillas would have had to kidnap him to get him into their ranks. Such a deprivation of liberty on account of political opinion would amount to persecution.[8]

In light of this specific threat of persecution, the Board erred in finding that Arteaga "presented no objective evidence which demonstrates that he as an individual would be singled-out and targeted for persecution or which supports his generalized assertions of persecution." Both the immigration judge and the BIA relied, in part, on the fact that Arteaga was never actually seized by the guerrillas. But that fact is not dispositive, because "[p]ersecution does not require an arrest." *Turcios v. INS,* 821 F.2d 1396, 1402 (9th Cir.1987). It is true that this court has held that "[t]he general level of violence or danger from antigovernment forces does not establish a claim of persecution." *Mendez–Efrain v. INS,* 813 F.2d 279, 282 (9th Cir.1987). However,

> not once have we considered a specific threat against a petitioner insufficient because it reflected a general level of violence.... It should be obvious that the significance of a specific threat to an individual's life or freedom is not lessened by the fact that the individual resides in a country where the lives and freedom of a large number of persons are threatened.

*Bolanos–Hernandez,* 767 F.2d at 1285. Accordingly, we reject the contention that the specific threat against Arteaga by the guerrillas fails to distinguish Arteaga's claim from a claim based on the generalized level of violence in the country.

■ The government's suggestion that Arteaga's claim is based on a desire to avoid military service mischaracterizes petitioner's position.[9] While Arteaga stated that he did not wish to serve in the Salvadoran army, that testimony goes to his neutrality; it is not the basis for his persecution claim. This court has rejected persecution claims based on the threat of conscription into a national army (as distinct from punishment for conscientious objection to military service). *See Kaveh–Haghigy v. INS,* 783 F.2d 1321 (9th Cir.1986). Whatever justification exists for distinguishing between national military conscription and deprivations of freedom, such justification does not apply to actions of nongovernmental groups, which lack legitimate authority to raise armies by conscription. Forced recruitment by a revolutionary army is tantamount to kidnapping, and is therefore persecution.

■ Because the BIA did not regard the guerrillas' kidnapping threat against Arteaga as an individualized threat, it did not adequately evaluate "whether the group making the threat ha[d] the will or the ability to carry it out." *Bolanos,* 767 F.2d at 1285–86.[10] The Supreme Court has sug-

---

8. Lack of consent separates a willing traveler from a kidnap victim. It is Arteaga's political opinion that set his will against joining the guerrillas, and it is the possibility that the guerrillas would overbear his will that constitutes the threat of persecution. Therefore, that persecution is "on account of political opinion." It is not relevant that the guerrillas may have been interested in conscripting Arteaga to fill their ranks rather than to "punish" Arteaga's neutrality. To find political persecution, all we need inquire of the guerrillas' motive is whether that motive is political. *See Florez-de Solis v. INS,* 796 F.2d 330, 335 (9th Cir.1986). Clearly, forced recruitment into the war against the government is politically motivated. *Cf. id.* (possible retribution for unpaid financial debt not political).

9. The government also cites cases rejecting claims based on membership in the "social

group" of young males of military age. *See Sanchez–Trujillo v. INS,* 801 F.2d 1571 (9th Cir. 1986); *Zepeda–Melendez v. INS,* 741 F.2d 285 (9th Cir.1984); *Chavez v. INS,* 723 F.2d 1431 (9th Cir.1984). In these cases, the petitioners' claims of persecution on account of group membership were unaccompanied by specific individual threats against them; in any event, they are inapposite to Arteaga's claim of individual political persecution.

10. The BIA simply discounted the threat by observing, as did the immigration judge, that the guerrillas did not subsequently contact Arteaga between the time of the threat in August 1983 and Arteaga's departure the following January. This fact is of limited persuasive value, however, given the course of developments in El Salvador at that time. It is well documented that the guerrillas began a forced recruitment drive in early 1984. *See, e.g.,* "Salvadoran Reb-

gested that a one-in-ten chance of the feared event occurring would make the fear well-founded. *Cardoza–Fonseca*, 107 S.Ct. at 1213. A specific verbal threat by the guerrillas directed at an individual whose identity and residence are known to the guerrillas is sufficient to create a well-founded fear. However, a remand is appropriate in this case since, as noted above, the Board did not properly apply the well-founded fear standard.

## CONCLUSION

The BIA erred by failing to distinguish between the applicable standards for withholding of deportation and political asylum. We remand this case to the BIA to allow it to apply the more generous well-founded fear standard to Arteaga's asylum claim.

els Begin to Conscript Civilians," New York Times, July 5, 1984, at A3; America's Watch, *Free Fire: A Report on Human Rights in El Salvador* 54–57 (5th Supp.1984); *see also* U.S. Dept. of State, Country Reports on Human Rights Practices for 1984, at 512 (Joint Comm. Print 1985). These developments lend objective support to Arteaga's fear of the guerrillas' threat and suggest that he may have left the country in the nick of time.