**Jairo Jonathan Elias ZACARIAS, Petitioner,**

v.

**U.S. IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 88–7507.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 13, 1990.

Decided July 23, 1990.

Amended Dec. 19, 1990.

---

Peter A. von Mehren, Wilmer, Cutler & Pickering, Washington, D.C., for petitioner.

Jill E. Zengler, U.S. Dept. of Justice, Washington, D.C., for respondent.

Before FLETCHER, PREGERSON and NELSON, Circuit Judges.

FLETCHER, Circuit Judge:

Elias Zacarias petitions for review of the denial of his application for political asylum

and withholding of deportation. We grant his petition for review in respect to his claim to eligibility for asylum.

## PRIOR PROCEEDINGS

Elias fled Guatemala in March of 1987. When he entered the United States in July of 1987, the respondent Immigration and Naturalization Service ("INS" or "Service") apprehended him. He conceded deportability and applied for asylum and withholding of deportation. After a hearing on December 14, 1987 (the "December hearing") before an Immigration Judge ("IJ"), his application was denied. He appealed to the Board of Immigration Appeals ("BIA" or "Board"). The Board summarily dismissed his appeal on procedural grounds. He then moved for reconsideration. The Board denied the motion. He then moved for reopening of his asylum and withholding of deportation claims in light of new evidence; the Board denied that motion also, but excused the prior procedural lapse and gave the merits of his appeal plenary consideration. He now petitions this court for review of all three of the Board's adverse rulings. Because the Board cured whatever mistake it might have made in summarily dismissing the first appeal, we do not review the denial of the motion to reconsider.[1] We treat the Board's denial of the motion to reopen as both an affirmance of the IJ's ruling after the initial hearing and as a denial of the motion to reopen.[2] We hold that the petitioner established eligibility for asylum at his initial hearing, but that the new evidence did not require the reopening of his withholding of deportation claim.

## DISCUSSION

We review, in effect, two records in this case. The first is the record that the petitioner made before the IJ at the December hearing. The second is that record supplemented by a letter from the petitioner's father, which was submitted for the first time as an exhibit accompanying his September 28, 1988 petition to the Board to reopen the proceedings.

### A. The December Hearing

At the December hearing, Elias testified that one evening in January of 1987, two uniformed guerrillas, carrying machine guns and wearing handkerchiefs to conceal their faces, approached the house where he and his parents lived. They identified themselves as guerrillas, and attempted to persuade him to join their ranks. Elias refused to join, despite their insistence. They told him to "think it [over] well" and said that they would be back. The petitioner, afraid that the guerrillas would come back and "take him," fled Guatemala approximately two months later.[3] He was eighteen at the time.

The record before the IJ at the hearing included, in addition to Elias' testimony, an advisory letter from the State Department regarding Elias' application. The letter said in relevant part:

> The applicant alleges fear of persecution because of civil conflict that afflicts parts of Guatemala and has caused various hardships and dangers, including forced recruitment by opposing armed forces.... Persons who flee their homelands due to national armed conflicts in which they are random victims of violence, intimidation, or recruitment are not generally classifiable as refugees under U.S. law.
>
> *This opinion is based on our analysis of country conditions and other rele-*

---

**1.** In its November 18, 1988 opinion denying the motion to reopen, the Board, in addition to addressing the sufficiency of the new evidence as a basis for reopening, explained for the first time why it found that the petitioner was not entitled to relief based on the evidence he presented at his hearing before the IJ. The petitioner had been denied review on the merits by the Board of the IJ's decision because the petitioner's lawyer had submitted the brief late, owing to erroneous information given by a

clerk of the Immigration Court. In its decision denying the motion to reopen, the Board said that it would "look beyond" the procedural mixup and review the IJ's decision on the merits.

**2.** The INS in its brief suggested that we treat the Board's rulings in this manner.

**3.** The IJ found Elias' testimony to be credible and the BIA did not disturb that finding.

*vant factors,* plus an evaluation of the specific information provided in the application.

Administrative Record at 86 (emphasis added).

The petitioner, of course, does not agree with the State Department's ultimate legal conclusion, but he asserts that the first sentence in the quotation constitutes a recognition by the State Department that both sides in Guatemala's civil war engage in forced recruitment. The INS argues that the sentence merely restates the petitioner's allegations.

■ We review the Board's factual findings under the "substantial evidence" standard and reverse if the BIA's findings are not substantially reasonable. *Artiga Turcios v. INS,* 829 F.2d 720, 723 (9th Cir.1987).

Both the face of the letter and the other evidence in the record convince us that the Service's interpretation of the letter is not supported by substantial evidence. The emphasized portion of the letter explicitly says that the State Department independently analyzed country conditions. Moreover, the State Department, in saying that "opposing armed forces" engage in forced recruitment, could not have been merely restating the petitioner's allegations, because nothing in the portion of the petitioner's asylum application reviewed by the State Department alleged forced recruitment by either side in the civil war, let alone *both* sides. When read in the context of the record as a whole, the letter supports the petitioner's claim that the guerrillas engage in forced recruitment.[4]

■ We now consider whether Elias' encounter with the guerrillas, coupled with the fact that the guerrillas engage in forced recruitment, entitles him to eligibility for asylum or withholding of deportation.

■ To obtain withholding of deportation, a person must show that, if deported to his home country, it is more likely than not that his life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion. Immigration and Nationality Act (INA) § 243(h), 8 U.S.C. § 1253(h); *INS v. Stevic,* 467 U.S. 407, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984). To establish eligibility for asylum, an applicant must show that he has a well-founded fear of persecution on account of at least one of those same five bases. INA § 208(a), 8 U.S.C. § 1158(a); INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A). A "well-founded fear" is a fear that is both genuine and objectively reasonable. To be objectively reasonable, there must be some reasonable possibility of persecution, but persecution does not have to be more likely than not. *INS v. Cardoza–Fonseca,* 480 U.S. 421, 450, 107 S.Ct. 1207, 1222, 94 L.Ed.2d 434 (1987).

The "reasonable possibility" standard derives from the Seventh Circuit's test for determining well-founded fear enunciated in *Carvajal–Munoz v. INS,* 743 F.2d 562, 574 (7th Cir.1984) ("Sometimes, however, the applicant's own testimony will be all that is available regarding past persecution or the reasonable possibility of persecution."). In *INS v. Cardoza–Fonseca,* 480 U.S. 421, 440, 107 S.Ct. 1207, 1217, 94 L.Ed.2d 434 (1987), the Supreme Court noted that the "reasonable possibility" standard was a "moderate interpretation" of Section 208(a)'s well-founded fear requirement. Subsequent Ninth Circuit case law has consistently expressed the risk of persecution that must be demonstrated in order to fulfill the objective requirement of

---

**4.** The petitioner also calls our attention to another document written by the State Department, a report by the Department to both houses of Congress in February, 1990, saying, *inter alia,*

> [T]he Communist guerrillas increased their campaign of violence which included destruction of public and private property, robbery, *forced recruitment* and labor, and indiscriminate use of land mines.

Department of State, 101st Cong., 2d Sess., *Country Reports on Human Rights Practices for 1989* (Joint Comm.Print 1990) (emphasis added).

We do not use the Report to support our conclusion that the BIA misread the State Department's letter. The BIA's decision was rendered before the Report was issued.

well-founded fear as a "reasonable possibility." *See, e.g., Mendoza Perez v. INS,* 902 F.2d 760, 763 (9th Cir.1990) ("To qualify for political asylum, the alien must show that ... persecution is a 'reasonable possibility.'"); *Ramirez Rivas v. INS,* 899 F.2d 864, 866 (9th Cir.1990) ("To be objectively reasonable, there must be some reasonable possibility of persecution ..., but persecution does not have to be more likely than not."); *Blanco–Comarribas v. INS,* 830 F.2d 1039, 1042 (9th Cir.1987) ("[S]o long as an objective situation is established by the evidence, it need not be shown that the situation will probably result in persecution, but it is enough that persecution is a reasonable possibility."); *Hernandez–Ortiz v. INS,* 777 F.2d 509, 513 (9th Cir.1985) ("The objective component is satisfied if persecution is, in fact, a 'reasonable possibility.'").

■ To demonstrate a reasonable possibility of persecution under this circuit's law, an applicant must present " 'specific facts' through objective evidence to prove 'good reason' to fear future persecution." *Cardoza–Fonseca v. INS,* 767 F.2d 1448 (9th Cir.1985) (quoting *Carvajal–Munoz v. INS,* 743 F.2d 562, 574 (7th Cir.1984)), *aff'd,* 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). This evidentiary burden is met by presenting evidence that is either documentary in nature or, in its absence, testimony that is "credible, persuasive, and refers to *specific* facts that give rise to an inference that the applicant has been or has a good reason to fear that he or she will be singled out for persecution.'" *Id.; see also De Valle v. INS,* 901 F.2d 787, 790 (9th Cir. 1990) ("The objective component requires a showing, by credible, direct and specific evidence in the record, of facts that would support a reasonable fear that the petitioner faces persecution."). Like the "reasonable possibility" standard, this evidentiary standard derives from the Seventh Circuit's test for determining well-founded fear enunciated in *Carvajal–Munoz v. INS,* 743 F.2d at 574. While the "reasonable possibility" standard defines the risk of persecution that satisfies the objective component of well-founded fear, the "credible, direct and specific evidence" standard mandates the type of evidence that must be proffered to establish it.

We note that while the two-pronged formulation of the well-founded fear test, requiring both a subjective component (fear) and an objective component (a reasonability possibility of persecution), is the proper test to be applied in this circuit, other formulations of the well-founded fear test may not be inconsistent with this formulation. Thus, in *Canas Cuadras v. INS,* 910 F.2d 567 (9th Cir.1990), this circuit upheld the use of the "reasonable person" test set forth by the Fifth Circuit in *Guevara–Flores v. INS,* 786 F.2d 1242 (5th Cir.1986), *cert. denied,* 480 U.S. 930, 107 S.Ct. 1565, 94 L.Ed.2d 757 (1987), as applied by the BIA in that case, because the BIA's analysis conformed with this circuit's formulation. First, the BIA determined that the applicant's fear was "subjectively genuine." 910 F.2d at 571. Second, it determined that there was an objectively "valid reason for the fear," and, thus, a reasonable possibility of persecution.[5] *Id.*

■■ The reasonable possibility of persecution to be established by the applicant need not come from the government in order for the alien to obtain relief; it can come from an entity which the government

5. The "reasonable person" standard for asylum conceivably could fall prey to the pitfall of failing to consider the circumstances of the applicant for asylum, in favor of considering whether an abstract person, divorced from this context, would experience fear of persecution. Application of that test in this manner would clearly be inconsistent with this circuit's formulation. However, the "reasonable person" standard need not be construed in this manner. As the Second Circuit explained in *Carcamo Flores v. INS,* 805 F.2d 60, 68 (2d Cir.1986):

> [I]n evaluating a claim based on the fear that would strike a "reasonable person", the board should be sensitive to the position into which the person is, hypothetically, being placed. What is relevant is the fear a reasonable person would have, keeping in mind the context of a reasonable person who is facing the possibility of persecution, perhaps including a loss of freedom or even, in some cases, the loss of life.

Applied in this manner, the "reasonable person" test is consistent with this circuit's formulation of the well-founded fear test.

is "unwilling or unable to control." *McMullen v. INS*, 658 F.2d 1312, 1315 & n. 2 (9th Cir.1981). Because nongovernmental groups lack legitimate authority to conscript persons into their armies, their acts of conscription are tantamount to kidnapping and constitute persecution.[6] *Arteaga v. INS*, 836 F.2d 1227, 1232 (9th Cir.1988); *see also Artiga Turcios*, 829 F.2d at 723. The persecution is properly categorized as "on account of political opinion," because the person resisting forced recruitment is expressing a political opinion hostile to the persecutor and because the persecutors' motive in carrying out the kidnapping is political. *Arteaga*, 836 F.2d at 1232 n. 8; *see also Maldonado–Cruz v. INS*, 883 F.2d 788, 791 (9th Cir.1989); *Bolanos–Hernandez v. INS*, 767 F.2d 1277, 1286 (9th Cir.1984) ("Because [alien] refused to join [guerrillas'] cause, the guerrillas are likely to consider him a political opponent").

■■■ An alien need not actually have suffered persecution in order to qualify for withholding of deportation or asylum. A threat of persecution can be enough. Indeed, with regard to withholding of deportation, the statute expressly speaks in terms of the *threat* to the alien's life or freedom. INA § 243(h). The threat can be an explicit verbal threat or a threat that is implicit from the circumstances. *Artiga Turcios*, 829 F.2d at 723. The key question is whether "there is reason to take the threat seriously." *Bolanos–Hernandez*, 767 F.2d at 1285. If it is "more likely than not" that the threat will be carried out, the petitioner is entitled to withholding of deportation. If there is a "reasonable possibility" that it will be carried out, the petitioner is eligible for asylum. In determining the likelihood that the alien will be persecuted, "we examine the guerrillas' will or ability to carry out the threat, not simply whether threats were made." *Rodriguez–Rivera v. INS*, 848 F.2d 998, 1006 (9th Cir.1988); *Arteaga*, 836 F.2d at 1232–33.

In *Rodriguez–Rivera*, the court faced a peculiar factual situation. The applicant, Rodriguez–Rivera, knew and worked with Salvador, the person chiefly responsible for the threats against him. 848 F.2d at 1000. Salvador died shortly after Rodriguez–Rivera fled the country. Salvador was a guerrilla, but, according to Rodriguez–Rivera's testimony, he threatened only that "'he' (Salvador) would kill Rodriguez–Rivera." *Id.* at 1006. Salvador did not state or imply that *the guerrillas* would kill Rodriguez–Rivera, that they had any interest in him, or that they even knew who he was or where he lived; Salvador stated only that *he* personally wanted to kill Rodriguez–Rivera. Thus, the BIA in that case reasonably could conclude that when Salvador died, the threat he personally presented died with him. Indeed, the court stated that "the fact that Salvador is now dead is the most significant factor supporting the BIA's determination." *Id.* Obviously, the testimony countering the ordinary inference that Salvador, as a guerrilla, was threatening Rodriguez–Rivera in order to carry out the goals of the guerrillas (as opposed to his own personal goals) was crucial to the outcome of that case. If the guerrillas had been aware of Rodriguez–Rivera's availability as a potential recruit, they could easily have assigned someone other than Salvador to do the dirty work, and the threat would have continued to be serious.

With regard to the two men who accompanied Salvador when he made a second threat against Rodriguez–Rivera, there was absolutely no evidence in the record suggesting that those men knew who Rodriguez–Rivera was or where he lived. In light of the statements made by Salvador while he and the two men were threatening Rodriguez–Rivera, it was not unreasonable to infer that the men's only interest in Rodriguez–Rivera was to assist Salvador in his personal vendetta. Neither the men's words, their conduct, nor the circumstances surrounding their encounter with Rodriguez–Rivera suggested that the guerrillas as a group had an interest in killing, kidnapping, or otherwise persecuting Rodriguez–Rivera. The BIA could thus reason-

---

**6.** The State Department in its advisory letter failed to recognize this; hence its legal error.

ably conclude[7] that when Salvador died, the two men did not have the *ability* to persecute Rodriguez–Rivera, because they did not know who he was or where he lived, and that they did not have the *will* to persecute him, because their only reason to bother him was to assist Salvador, who had died.

In *Arteaga*, the alien was confronted at his house by a group of guerrillas who tried to induce him to join their cause. After he refused, they said to him: "Even if you don't come, we'll get you." *Arteaga*, 836 F.2d at 1228. In *Arteaga*, unlike in *Rodriguez–Rivera*, there was no evidence contradicting the common sense inference that the threat was from the guerrillas as a group and not just from the particular individuals assembled at his house.

The court stated in *Arteaga* that "a specific verbal threat by the guerrillas directed at an individual whose identity and residence are known to the guerrillas is sufficient to create a well-founded fear." 836 F.2d at 1233. In *Rodriguez–Rivera*, 848 F.2d at 1006, the court observed that this statement in *Arteaga* had to be qualified by the holding in *Bolanos–Hernandez*, 767 F.2d at 1285–86, that the group making the threat had to have the "will or ability" to carry it out. This observation was unremarkable because the *Arteaga* court itself qualified the statement in the same way. *Arteaga*, 836 F.2d at 1232 (citing *Bolanos–Hernandez*).

After making its observation, the *Rodriguez–Rivera* court then said that "the entire discussion of the eligibility for asylum in *Arteaga* was dicta[.]" *Rodriguez–Rivera*, 848 F.2d at 1006. The *Rodriguez–Rivera* court did not say that *Arteaga*'s analysis of asylum was *incorrect*. To the extent that *Rodriguez–Rivera* implied *Arteaga* was incorrect, that implication would itself be dicta, for nothing in *Rodriguez–Rivera*'s holding was inconsistent with *Arteaga*'s discussion of eligibility for asylum. In any event, the reasoning in the two cases can be reconciled; both *Arteaga* and

*Rodriguez–Rivera* followed *Bolanos–Hernandez*.

■ *Rodriguez–Rivera*, *Arteaga*, and *Bolanos–Hernandez* together stand for the proposition that when a member of a group which engages in violence makes a threat, and there is no evidence that the member has only personal motives for making the threat, the reasonable inference is that the *group* is responsible for the threat and that the will or ability of the *group* should be examined to determine if it is reasonable to take the threat seriously.

Examining the facts in light of these authorities, we conclude that Elias established eligibility for asylum at the December hearing but that he did not establish entitlement to withholding of deportation. There is no dispute that Elias' fear of persecution was genuine and that he thus satisfied the subjective test for eligibility for asylum. He testified credibly that he feared the guerrillas would return and "take" him against his will. The dispute is over whether he satisfied the objective test and showed there was a reasonable possibility that the guerrillas would forcibly recruit him.

The Board's crucial error was its conclusion that the Guatemalan guerrillas do not engage in forced recruitment. For the reasons stated above, the State Department letter was proof that the guerrillas do engage in forced recruitment. The Board's error colored its analysis of the circumstances surrounding the guerrillas' encounter with Elias. After the guerrillas failed in their attempt to persuade Elias to join voluntarily, they told him to "think it [over] well" and that they would be back. Because the Board believed that the guerrillas did not engage in forced recruitment, it did not think it reasonable for Elias to interpret the guerrillas' statements to constitute a threat of persecution. But in light of the guerrillas' practice of using force to recruit people, it certainly was reasonable for a person in Elias' situation to take the statements as threats. *See*

7. The asylum applicant in *Rodriguez–Rivera* did not mention in his application the two most significant threats that he testified to in his

hearing. *Rodriguez–Rivera*, 848 F.2d at 1000. That cast some doubt on his credibility and affected the court's review.

*Artiga Turcios,* 829 F.2d at 723–24 (focus is on whether it was reasonable for the alien to perceive the circumstances as threatening). Moreover, the men who attempted to recruit him carried machine guns and wore masks, lending further credence to Elias' belief that he was being threatened.[8]

We now consider whether the guerrillas had the will and ability to persecute Elias. The fact that the guerrillas engaged in forced recruitment is proof that they had the will to persecute Elias. That Elias was not harmed in the two-month period during which he was preparing to leave the country is relevant, but as we said in *Rivas v. INS,* 899 F.2d 864, 871–72 (9th Cir.1990), the fact that some time passed without harm has only marginal probative value. *Rivas* and the cases it cited as support for that proposition found that the alien had established a clear probability of persecution despite short periods without harm. In addition to having the will to persecute Elias, the guerrillas had the ability to persecute him because they knew where he lived and who he was.

Finally, the threat to Elias was for political as opposed to personal reasons; the Board did not suggest that the individual guerrillas who appeared at his door had a personal quarrel with Elias, and in any event, there was no evidence to rebut the common sense inference that the guerrillas were interested in recruiting Elias to further the *group*'s political goals. There was thus a reasonable possibility, based on the evidence presented at the December hearing, that the guerrillas would return

and take Elias by force, thereby persecuting him on account of political opinion. The Board's conclusion that Elias was ineligible for asylum was not substantially reasonable. *See Artiga Turcios.*

The Board, however, was substantially reasonable in concluding that Elias failed to prove the "clear probability" of persecution necessary to obtain withholding of deportation. Elias did not present evidence suggesting that forced recruitment by the Guatemalan guerrillas occurred with such frequency that it would be more likely than not that Elias would be forcibly recruited.[9] Nor did he present evidence that members of his family or other persons whom he knew were the victims of forced recruitment. *Cf. Bolanos–Hernandez,* 767 F.2d at 1280 (petitioner's friends had been killed after receiving threats by Salvadoran guerrillas; entitlement to withholding of deportation established). Either kind of evidence would have strengthened his case. Nonetheless, the fact that the Guatemalan guerrillas use forced recruitment with sufficient frequency for the State Department to have taken notice and that they had once approached Elias masked and armed and had promised to return, demonstrates that there was a reasonable possibility that the guerrillas would return and take Elias.[10]

## B. The Motion to Reopen

■ About ten months after the December Hearing, Elias' father wrote him a letter saying that guerrillas had returned to the house two times after Elias had fled (and after the time of the hearing) and that

---

8. The BIA thought it significant that the guerrillas did not actually point the weapons at Elias. Had they done that, we might have a case of actual persecution rather than a case of threatened persecution. *Cf. Cardoza–Fonseca v. INS,* 767 F.2d 1448, 1453 (9th Cir.1985), *aff'd INS v. Cardoza–Fonseca,* 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) ("evidence of past persecution or a threat of future persecution" can establish well-founded fear).

At oral argument the lawyer for the INS indulged in the wholly unwarranted speculation that the guerrillas wore handkerchiefs not to conceal their faces but "because it might have been dusty that day."

9. In many of our cases concerning threats by the Salvadoran guerrillas, this issue apparently

was not even in dispute, perhaps because the practices of the Salvadoran guerrillas are well-documented. *See e.g. Artiga Turcios; Maldonado–Cruz,* 883 F.2d at 791–92 ("Maldonado 'is likely to be persecuted by a politically motivated group that frequently engages in terrorist tactics directed at those who refuse to join its armed political struggle.'") (quoting *Bolanos–Hernandez,* 767 F.2d at 1287).

10. We do not imply that information regarding conditions and practices in a country *must* come from a government agency such as the State Department. Evidence from other sources also can be highly probative.

they had asked for Elias and his father both times. The first time, only Elias' mother was home; she told them her son and her husband were out, and she refused to be more specific. They left. The second time, three months later, Elias' father was home. They attempted to recruit the father, but according to the letter, they were more interested in Elias, since the father was 60 years old. He told them that Elias had fled to the United States.

Elias, in his motion to reopen, argued to the Board that this new evidence in conjunction with the evidence presented at the December Hearing established a prima facie case of entitlement to withholding of deportation and of eligibility for asylum. Since we have held that Elias established his eligibility for asylum without the additional evidence, we consider only whether a prima facie case has been established for withholding of deportation.

As a threshold matter, we address the standard of review for petitions to review motions to reopen.

In *INS v. Abudu*, 485 U.S. 94, 108 S.Ct. 904, 911–12, 99 L.Ed.2d 90 (1988), the Supreme Court noted that the BIA can deny a motion to reopen on any of three independent grounds:

> First, it may hold that the movant has not established a prima facie case for the underlying substantive relief sought. *The standard of review of such a denial is not before us today* [.] Second the BIA may hold that the movant has not introduced previously unavailable, material evidence, 8 CFR § 3.2 (1987), or, in an asylum application case, that the movant has not reasonably explained his failure to apply for asylum [11] initially, 8 CFR § 208.11 (1987).... We decide today that the appropriate standard of review of such denials is abuse of discretion. Third, in cases in which the ultimate grant of relief is discretionary (asylum ... but not withholding of deportation), the BIA may leap ahead, as it were, over the two threshold concerns (prima facie case and new evidence/reasonable

explanation), and simply determine that even if they were met, the movant would not be entitled to the discretionary grant of relief. We have consistently held that denials on this third ground are subject to an abuse-of-discretion standard.

(Emphasis added). In *INS v. Abudu*, the Supreme Court reversed our decision in *Abudu v. INS*, 802 F.2d 1096 (9th Cir.1986) because we read the BIA's opinion in that case to constitute a denial only on the first ground, when in fact the BIA also denied the alien's claim on the second ground, because he did not adequately explain why he had failed to apply for asylum at his initial hearing.

The Supreme Court made it clear throughout its opinion that it was addressing only the standard of review for denials of motions to reopen based on questions such as: whether the evidence was available at the time of the original deportation hearing; if it was available, whether the moving party had a reasonable excuse for failing to adduce it; if it was not available, whether there was other significant evidence at the time of the hearing such that the moving party should have pressed claims based on that evidence and not delayed. These questions all help to ferret out cases where parties present new evidence principally for the purpose of causing delay. The Supreme Court in *INS v. Abudu*, 108 S.Ct. at 914, reasoned that any tribunal, administrative or otherwise, ought to have broad discretion to deter such abuses.

That reasoning does not apply with the same force when the tribunal has found that the movant's failure to adduce the evidence was most likely not attributable to a desire for delay and when the tribunal has chosen to address the merits. Indeed, when the substantive issue being litigated is the probability of *future* events occurring, as it frequently is in asylum and withholding cases, there are particularly compelling reasons for allowing the merits of the alien's claim to be given a hearing in light of evidence of new developments.

---

11. The Board treats asylum applications also as applications for withholding of deportation, 8 C.F.R. § 208.3(b) (1987), so this ground applies to withholding claims as well.

Those new developments can substitute for the speculation on which the initial judgment was based.

In any event, the Supreme Court explicitly stated in *INS v. Abudu* that it was not addressing the standard of review for denials of motions to reopen based on the failure to establish a prima facie case. Our discussion in *Abudu v. INS* of the appropriate standard of review for denials of reopening based on the alien's failure to make a prima facie case of eligibility for asylum [12] or withholding of deportation therefore still stands.

In *Abudu v. INS*, we held that the standard of review is "abuse of discretion." 802 F.2d at 1100. More specifically, we held that "the Board must accept the factual statements in the alien's affidavits as true," *id.* at 1101, and that the Board abuses its discretion if it fails to find a prima facie case established when the evidence in the affidavits satisfies the requirements for eligibility for substantial relief. *Id.* at 1100. We had so held in a number of previous cases. In *Aviles–Torres v. INS*, 790 F.2d 1433, 1436 (9th Cir.1986), for example, we held that "[t]he Board must accept the factual statements in the alien's affidavits as true unless they are inherently unbelievable" and that "[t]he Board has no discretion if the alien proves his [prima facie] claim." In *Sakhavat v. INS*, 796 F.2d 1201 (9th Cir.1986), we held that "the BIA abused its discretion when it disbe-

lieved affidavit evidence that was not inherently incredible," and found that the BIA erred "by either ignoring or prematurely discrediting key elements of Sakhavat's prima facie case." *Id.* at 1204–05 (citations and internal quotations omitted); *see also Ghadessi v. INS*, 797 F.2d 804, 806–07 (9th Cir.1986) (faulting Board for its "weighing of the quality, rather than the sufficiency" of evidence in a motion to reopen). In *Abudu v. INS*, 802 F.2d at 1101, we extended the reasoning of these cases and held that on a motion to reopen, the Board "must draw reasonable inferences from the facts [pertaining to the merits of the prima facie case] in favor of" the moving party. The evidence in *Abudu v. INS* came exclusively from affidavits. In a case where some of the evidence is developed at a hearing, the BIA is of course free to interpret that evidence free from inferences in favor of the moving party. The BIA's conclusions derived from that evidence will be accepted by the reviewing court if it is supported by substantial evidence. *See Artiga Turcios*, 829 F.2d at 723.

In the case under consideration, the Board denied the motion to reopen because of Elias' failure to furnish sufficient additional evidence, when taken together with the evidence adduced at the hearing before the IJ, to make out a prima facie case, the first ground identified by the Court in *INS v. Abudu*.[13] We therefore apply the stan-

---

**12.** The determination of whether an alien is *eligible* for asylum as a "refugee" within the meaning of INA § 101(a)(42)(A), as opposed to whether he is entitled to the ultimate *grant* of asylum, is not within the BIA's discretion. *See Hernandez–Ortiz v. INS*, 777 F.2d 509, 518 (9th Cir.1985).

**13.** The INS seems to suggest in one cryptic sentence in its brief that the BIA denied the motion to reopen not only because the new evidence, combined with the old, did not establish a prima facie case, but because the new evidence was not "material" within the meaning of 8 C.F.R. § 3.2. The Board mentioned the materiality requirement, but to the extent the Board applied it, it did so in such a way as to equate "material evidence" with evidence sufficient to make out a prima facie case. The Supreme Court in *INS v. Abudu* stated that the BIA has broad discretion to deny motions based on new evidence that is not material. 108 S.Ct. at 909 n.

3. To read "material" the way the Board apparently did in this case would be to render meaningless the Supreme Court's careful distinction in *INS v. Abudu* between denials based on materiality and denials based on failure to establish a prima facie case. By "material" evidence, the Supreme Court could only have meant evidence tending to strengthen the alien's claim for relief, not evidence so probative that it would establish a prima facie case for relief.

The Board's confusion is evidenced by the fact that it based its definition of materiality on a misquotation from the Supreme Court's decision in *INS v. Abudu*. The BIA quoted *INS v. Abudu* to say at page 914: " 'Material evidence,' in the context of a motion to reopen, is evidence the facts of which 'are of such a nature that they will probably change the results if [a new hearing is held].' " We cannot find the words quoted or anything resembling them at the page cited, or indeed anywhere in the Supreme Court's opinion. Wherever this quotation

dard of review from our decision in *Abudu v. INS*.

The BIA accepted the father's letter as true, but it denied the claim of eligibility for asylum (and *a fortiori* the claim for withholding of deportation) because it believed there was no new evidence that the guerrillas engaged in forced recruitment. We disagreed with the Board's assessment of the initial evidence, because, as we stated above, it was error to find that the guerrillas do not engage in forced recruitment; however, we agree with the Board's assessment of the evidence on the motion to reopen. The petitioner's new evidence may have strengthened his claim to eligibility for asylum[11] but it did not cure the key deficiency in his withholding of deportation claim. To show that forced recruitment was more than a reasonable possibility, Elias needed to present more specific evidence concerning the extent of forced recruitment by the guerrillas, either in the country at large or as it affected him, members of his family or other people whom he knew. *Cf. Bolanos-Hernandez*, 767 F.2d at 1280.

## CONCLUSION

Elias established his eligibility for asylum; he did not establish his entitlement to withholding of deportation. To that extent, the petition for review is granted. We remand to the Board to exercise its discretion with respect to the petitioner's asylum application.

comes from, it sounds more like the definition of new evidence sufficient to make a prima facie case on reopening than it does the definition of "material."

**14.** The *only* reason given by the Immigration Judge for denying Elias' asylum application at the December hearing was that Elias did not present evidence that the guerrillas had returned before he fled. That they apparently did return illustrates why we generally do not think it is reasonable for the Board to accord significant weight to short periods where no incidents occur.