**Genaro Hermino
RODRIGUEZ–RIVERA,
Petitioner,**

v.

**U.S. DEPARTMENT OF IMMIGRATION
AND NATURALIZATION, Respondent.**

No. 87–7140.

United States Court of Appeals,
Ninth Circuit.

Submitted Jan. 22, 1988.*

Decided June 7, 1988.

As Amended Aug. 12, 1988.

---

* The panel finds this case appropriate for submission without oral argument pursuant to Ninth Circuit Rule 34–4 and Fed.R.App.P. 34(a).

Anne Kreider, Southern Arizona Legal Aid, Inc., Tucson, Ariz., for petitioner.

Ellen Sue Shapiro, Acting Asst. Director, Office of Immigration Litigation, Civ. Div., Washington, D.C., for respondent.

Before WALLACE, SNEED and POOLE, Circuit Judges.

**PER CURIAM:**

Rodriguez–Rivera petitions for review of a final order of the Board of Immigration Appeals (BIA) denying his request for asylum and withholding of deportation. We have jurisdiction pursuant to 8 U.S.C. § 1105a. We affirm the BIA's decision and deny the petition for review.

**I**

Rodriguez–Rivera is a twenty-eight year old citizen of El Salvador. In February 1982, he was issued a passport, left El Salvador, traveled through Guatemala and Mexico, and in March 1982 entered the United States without inspection. After his arrest, the Immigration and Naturalization Service (INS), in April 1982, instituted deportation proceedings against him. Rodriguez–Rivera, through his certified representative, conceded deportability. The immigration judge (IJ) adjourned the hearing in order to permit Rodriguez–Rivera to petition for withholding of deportation and asylum.

In his April 1983 application, Rodriguez–Rivera stated that he feared that he would "be killed summarily" solely because of his political beliefs and because he refused induction into military service. He also stated that he would be persecuted if he returned to El Salvador because he fled the country, because he applied for political asylum in the United States, and because he refused induction into military service. In addition, he stated that he was in a different position than the rest of El Salvador's citizens because he refused to support violence, because he was and is a Catholic, and because he did not vote in the March 1982 elections. The application recounted no incident of persecution of Rodriguez–Rivera or anyone known to him, but did state that he "had to flee in fear for my life from the utter terror of life that the civil war has caused."

Rodriguez–Rivera's hearing resumed in July. The IJ received Rodriguez–Rivera's application, as well as a letter from the State Department Bureau of Human Rights and Humanitarian Affairs stating that on the basis of Rodriguez–Rivera's

application, he did not appear eligible for asylum because he failed to establish a well-founded fear of persecution on account of his race, religion, nationality, membership in a particular social group, or political opinion.

Rodriguez–Rivera's representative advised the IJ that Rodriguez–Rivera based his asylum application "on his membership in a social group known as Poor Urban Workers and on his political opinion." In support of these claims, Rodriguez–Rivera testified that at age nineteen, he obtained a job as a tailor and moved to Alminian, El Salvador. He stated that in early 1980, the Alminian police incarcerated him for failing to carry an identification card as required by El Salvador law. He did not testify how long the police detained him and did not testify that they mistreated him in any way.

He also testified that later in 1980, the Army detained him in order to require him to carry out his military service commitment; however, he stated that he escaped and went into hiding. Fifteen days later, he again encountered military authorities, but was not detained. He testified that he did not wish to serve in the military because he was "neutral" and did not believe that as a Catholic he could kill another human being, but did not explain how he avoided military conscription from early 1980 until February 1982, and did not indicate that any military authorities ever approached him during that time. He acknowledged, however, that the teachings of the Catholic Church do not prohibit military service and that El Salvador requires all able-bodied young men to serve in the military.

Rodriguez–Rivera also testified that he feared persecution because of two incidents he did not mention in his asylum application. First, he testified that he knew a teacher named Penny and that he had spoken to witnesses who said that the armed forces killed four members of Penny's family because Penny was a suspected guerrilla. He did not indicate that he was related to Penny or any member of her family or that he knew or participated in any

political activities with Penny. Moreover, he testified that Penny was still alive.

Second, Rodriguez–Rivera testified that in December 1981 while at work, a guerrilla named Salvador attempted to recruit him. Rodriguez–Rivera stated that he declined the invitation, and Salvador stated that Rodriguez–Rivera would be "sorry" for not joining the guerrillas. Rodriguez–Rivera testified that he understood Salvador's comment to be a death threat. He then testified that later that month Salvador returned with two other individuals who put guns against his ribs and a gun against his head and threatened to kill him. Rodriguez–Rivera testified that he asked them not to kill him, and they complied and left. Rodriguez–Rivera stated that his brother had informed him that Salvador was now dead.

At some point following this second incident with Salvador, Rodriguez–Rivera decided to come to the United States because he was afraid that Salvador might try to kill him due to his neutrality. He also testified that he did not report Salvador's threats to the authorities because he feared that the authorities would then kill Salvador, and he did not want Salvador to die.

The IJ denied Rodriguez–Rivera's requests for asylum and withholding of deportation. The IJ stated that in order to qualify for asylum, Rodriguez–Rivera needed to satisfy 8 U.S.C. § 1101(a)(42)(A)'s definition of refugee: one who is unwilling or unable to return to his homeland because of a well-founded fear of persecution on account of race, religion, political opinion, nationality, or membership in a particular social group. The IJ then stated that Rodriguez–Rivera based his asylum claim on his political opinion and his membership in a particular social group. After a lengthy review of the evidence, the IJ rejected Rodriguez–Rivera's argument that "poor urban workers" or "those who wish to remain neutral" constitute a "particular social group" within the meaning of section 1158(a). The IJ then rejected his argument that he had a well-founded fear of persecution on account of his political opinion. The IJ found that Rodriguez–Rivera had never

been politically active and had never expressed his political viewpoint in El Salvador. Regarding the two instances of alleged persecution, the IJ concluded that the incident involving Penny did not relate to Rodriguez–Rivera and did not support his claim of persecution. As for the incident with Salvador, the IJ observed that Rodriguez–Rivera remained in El Salvador for nearly two months following his last encounter with Salvador, that Salvador was now dead, and that there was no indication that any guerrilla group was presently interested in Rodriguez–Rivera.

Having concluded that Rodriguez–Rivera did not qualify for asylum, the IJ found *a fortiori* that Rodriguez–Rivera was not entitled to withholding of deportation. Voluntary departure to Costa Rica was granted. Rodriguez–Rivera appealed and the BIA dismissed his appeal, affirming the denial of his request for withholding of deportation and asylum. He timely petitioned our court for review.

We review questions of law, such as whether the BIA applied the appropriate legal standard, de novo. *Arteaga v. INS*, 836 F.2d 1227, 1228 (9th Cir.1988) (*Arteaga*). We review the factual findings underlying the BIA's decision under the "substantial evidence" standard. *Id.* Although under this standard we review the findings by a slightly stricter scrutiny than the clear error standard, we "must be careful to keep it sufficiently more deferential than de novo review." *Diaz–Escobar v. INS*, 782 F.2d 1488, 1492 (9th Cir.1986) (*Diaz–Escobar*). In our government of separated powers, the judiciary must not " 'usurp Congress's grant of authority to the Attorney General by applying what approximates de novo appellate review.' " *Id.*, quoting *INS v. Rios–Pineda*, 471 U.S. 444, 452, 105 S.Ct. 2098, 2103, 85 L.Ed.2d 452 (1985). Under the substantial evidence standard, courts may not reverse the BIA simply because they disagree with its evaluation of the facts. *Id.* at 1493. "All the substantial evidence standard requires is that the BIA's conclusion, based on the evidence presented, be substantially reasonable." *Id.*

## II

On appeal, Rodriguez–Rivera challenges the denial of both his request for asylum and his request for withholding of deportation. First, he argues that the IJ applied the more stringent "clear probability" standard in assessing his asylum claim, that the BIA erred in assessing his claim that his neutrality constituted a political opinion under section 1158(a), and that the BIA's conclusion concerning his asylum claim is not supported by substantial evidence. Second, he argues that the BIA's conclusion concerning his claim for withholding of deportation is not supported by substantial evidence. We examine each argument in turn.

### A.

Under section 1158(a), the Attorney General has discretion to grant an alien political asylum if the Attorney General determines the alien is a refugee within the meaning of 8 U.S.C. § 1101(a)(42)(A). 8 U.S.C. § 1158(a). Section 1101(a)(42)(A) defines a refugee as any person outside his country of nationality or habitual residence who is unable or unwilling to return to that country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Under section 1158(a), therefore, asylum is a two stage analysis involving, first, a determination of statutory eligibility based on the well-founded fear standard and then, if eligibility is established, a discretionary determination concerning asylum. *Diaz–Escobar*, 782 F.2d at 1491.

The well-founded fear standard includes both an objective and subjective component. *See INS v. Cardoza–Fonseca*, 480 U.S. 421, 107 S.Ct. 1207, 1212–13, 94 L.Ed. 2d 434 (1987). The well-founded fear standard requires an examination of the asylum applicant's subjective feelings that he or she will be persecuted, along with an examination of the objective nature of the articulated reasons for the alien's fear of persecution. *See Rodriguez v. INS*, 841 F.2d

865, 868 (9th Cir.1988) (*Rodriguez*); *Sanchez–Trujillo v. INS*, 801 F.2d 1571, 1579 (9th Cir.1986) (*Sanchez–Trujillo*); *Rebollo–Jovel v. INS*, 794 F.2d 441, 443 (9th Cir.1986) (*Rebollo–Jovel*). The subjective component requires that the fear be genuine, while the objective component "requires a showing, by credible, direct, and specific evidence in the record, of facts that would support a *reasonable* fear that the petitioner faces persecution." *Rebollo–Jovel*, 794 F.2d at 443, *quoting Diaz–Escobar*, 782 F.2d at 1492 (emphasis added).

### 1.

■ First, Rodriguez–Rivera argues that the IJ applied the more stringent clear probability standard, which is applicable to withholding of deportation claims, to his asylum claim. This argument is correct in that the IJ concluded that the qualifying language applicable to a claim for asylum was the same as that applicable to a claim for withholding of deportation. However, if the BIA correctly distinguished and applied the two standards, the IJ's error is harmless. *Quintanilla–Ticas v. INS*, 783 F.2d 955, 957 (9th Cir.1986) (*Quintanilla–Ticas*). It is the BIA that we review. Thus, we must focus on the BIA's opinion.

■ The BIA began its opinion with a discussion of the difference between the standards applicable to withholding of deportation and asylum. The BIA cited *Cardoza–Fonseca v. INS*, 767 F.2d 1448 (9th Cir.1985), *aff'd*, 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987), and *Bolanos–Hernandez v. INS*, 767 F.2d 1277 (9th Cir. 1985) (*Bolanos–Hernandez*), and stated that the well-founded fear standard applicable to a claim for asylum is meaningfully different and more generous than the clear probability standard applicable to a claim for withholding of deportation. The BIA then quoted the following from the Ninth Circuit's decision in *Cardoza–Fonseca v. INS*, 767 F.2d at 1453, in order to clarify the objective component of the well-founded fear standard:

> Applicants must point to specific, objective facts that support an inference of past persecution or risk of future perse-

cution. That the objective facts are established through the credible and persuasive testimony of the applicant does not make those facts less objective. "Mere assertions of possible fear" are still insufficient. *Shoaee v. INS*, 704 F.2d 1079, 1084 (9th Cir.1983). It is only after objective evidence sufficient to suggest a risk of persecution has been introduced that the alien's subjective fears and desire to avoid the risk-laden situation in his or her native land become relevant.

The BIA then discussed the evidence that Rodriguez–Rivera presented in support of his persecution claim and concluded that he "has not shown a clear probability of persecution under section 243(h) or a well-founded fear of persecution under section 208(a), as that standard is described in *Cardoza–Fonseca* ... based on any of the enumerated grounds within the Act for which asylum and withholding of deportation may be granted."

Admittedly, the BIA did not analyze the evidence presented in support of the asylum and withholding of deportation claim in separate paragraphs. However, "[w]here the BIA correctly acknowledges the two standards, it is not required to assess the entire evidence twice, once under the heading of clear probability and a second time under the heading of well-founded fear." *Quintanilla–Ticas*, 783 F.2d at 957. Moreover, a reading of the entire decision with its citation to *Cardoza–Fonseca* and the lengthy quotation from that decision concerning the appropriate differing standards applicable to claims for asylum and withholding of deportation convinces us that the BIA applied the distinctive and more generous well-founded fear standard to the petitioner's asylum claim. *See Sanchez–Trujillo*, 801 F.2d at 1578–79 (upholding a BIA decision that similarly quoted at length from this court's decision in *Cardoza–Fonseca*, and that also made clear that the BIA was applying the distinction articulated in that case).

*Rodriguez* does not require us to reach a different result. In that case, the BIA invoked particular "boiler-plate" language

that failed to make clear that the BIA had applied "a more generous standard to an asylum claim than a claim for withholding of deportation. The BIA also affirmatively and repeatedly stated that the clear probability and well-founded fear standards converge and that they are not meaningfully different. *Rodriguez*, 841 F.2d at 868. Here, by contrast, the BIA cited and quoted from *Cardoza–Fonseca* and expressly recognized that the "well-founded" fear standard was more generous.

Nor does *Arteaga* require us to reach a different result. In *Arteaga*, we faced an argument similar to the one petitioner makes in this case: notwithstanding the BIA's citation to and quotation from *Cardoza–Fonseca*, the BIA applied the more stringent clear probability standard when assessing the petitioner's asylum claim. In *Arteaga*, our analysis was guided by our holding in *Sanchez–Trujillo* that the BIA's lengthy quotation from *Cardoza–Fonseca* and a review of the entire BIA opinion indicated that the BIA applied the more generous well-founded fear standard to an asylum claim notwithstanding its occasional use of "inartfully chosen" words indicating that it may have applied the more stringent clear probability standard. *Arteaga*, 836 F.2d at 1230. Nevertheless, in *Arteaga* we concluded that, unlike *Sanchez–Trujillo*, the BIA's decision, taken as a whole, indicated that it applied the more rigorous clear probability standard notwithstanding its citation of *Cardoza–Fonseca*. *Id.* at 1230–31. In reaching this conclusion, we found *Sanchez–Trujillo* distinguishable because (1) although the BIA cited *Cardoza–Fonseca*, it stated that "the Board's analysis of [the well-founded fear standard] is set forth in *Acosta*," a BIA decision that, contrary to Ninth Circuit precedent, conflates the two distinct standards, (2) the BIA stated that Arteaga "failed to demonstrate that he as an individual would be singled-out and targeted for persecution" while citing cases applying the clear probability standard, and (3) the BIA stated that "there is no evidence that the respondent was ever persecuted or which suggests the *likelihood* that he will be if returned to El Salvador." *Id.* at 1230. We concluded that

the word "likelihood" indicated that the BIA applied the more stringent clear probability standard. *Id.*

We see certain similarities between the factors in the BIA opinion analyzed in *Arteaga* and the BIA opinion in the instant case. First, both opinions cited and quoted from our opinion in *Cardoza–Fonseca* which recognized that the well-founded fear standard is more generous. Second, both opinions stated that the Board's analysis of the well-founded fear standard is set forth in *Acosta*, although the BIA's opinion in the instant case, unlike *Arteaga*, immediately qualified this statement by stating that "[t]he Ninth Circuit has concluded that the 'well-founded fear' standard and the 'clear probability' standard are meaningfully different and that the former is 'more generous' than the latter. *Cardoza–Fonseca v. INS*, 767 F.2d 1448, 1451 (9th Cir.1985); *Bolanos–Hernandez v. INS*, supra, at 1281." Third, both opinions stated that the petitioner had failed to establish that he would be singled out for persecution. *Compare Arteaga*, 836 F.2d at 1230 (the BIA's statement that "Arteaga" failed to demonstrate that he as an individual would be singled out and targeted for persecution) *with* (the BIA's statement that "[t]he respondent also has failed to establish that the guerrillas will single him out for persecution.") However, the statement in the BIA's opinion in the case before us, unlike *Arteaga*, was not immediately followed by the citation of cases that applied the clear probability standard. As in *Sanchez–Trujillo*, the BIA's statement in the instant case concerning being singled out for persecution essentially declared that the petitioners had failed to demonstrate "that they have been or will be singled out for persecution." *Sanchez–Trujillo*, 801 F.2d at 1579.

The only statement that the BIA did not make in evaluating Rodriguez–Rivera's claim that it did make in evaluating Arteaga's claim was that there was no evidence that *Arteaga* "was ever persecuted or which suggests the *likelihood* that he will be if returned to El Salvador." *Arteaga*, 836 F.2d at 1230. The BIA in the case

before us did, however, state that "[t]he respondent also has failed to establish that the guerrillas will single him out for persecution. In the context presented, the applicable standard is that he must prove *a likelihood of persecution* by some nongovernmental individual or organization from whom the El Salvadoran government is either unwilling or unable to protect him." (Emphasis added.)

Because all of the factors that we found significant in *Arteaga* are absent in this case, *Sanchez–Trujillo* governs our decision. We do not arrive at this conclusion solely because the BIA immediately qualified its citation of *Acosta*, or because the BIA's statement concerning Rodriguez–Rivera's failure to establish that he would be singled out for persecution was not immediately followed by the citation of cases applying the clear probability standard or because of the conjugation of the verb preceding the word persecution or because the use of the phrase "likelihood of persecution" is slightly different in the two cases. To base our conclusion on such distinctions would impermissibly raise the factors mentioned in *Arteaga* to the status of shibboleths upon which a case will turn. Indeed, to do so might result in reversal of any BIA opinion citing *Acosta* or citing a case that fails to distinguish between the two standards within the body of the opinion evaluating the evidence or containing the inartful use of the phrase "likelihood of persecution." Such a result would be inconsistent with our decisions admonishing us not to review the BIA's application of the appropriate legal standards on the basis of "certain magic words," *see Rebollo–Jovel*, 794 F.2d at 444, including the words "*Acosta*" or "likelihood of persecution." We must remember that we conduct a case-by-case review to determine what the BIA actually did. *Id.* Thus, we read *Arteaga* as doing nothing more than reaffirming the basic principle announced in *Sanchez–Trujillo* that we will examine the BIA's entire opinion to determine whether the BIA applied the proper standard. *See Sanchez–Trujillo*, 801 F.2d at 1578–79. Accordingly, even the presence of all three factors we found significant in *Arteaga* would not necessarily mandate reversal in another case, if after examining the entire BIA opinion, we concluded that the BIA applied the appropriate legal standards.

As shown earlier, the BIA's entire opinion indicates that it did apply the more generous well-founded fear standard to Rodriguez–Rivera's asylum claim. As in *Sanchez–Trujillo*, we do not believe that the use of "one particular word" is dispositive, nor do we believe that the mere citation to *Acosta* or to other authorities that fail to recognize a distinction between the well-founded fear standard and the clear probability standard mandates reversal. *See id.* at 1579. A few "inartfully chosen words" or citations will not overcome the clear indication, confirmed by citations to Ninth Circuit or Supreme Court authority recognizing a distinction between the applicable standards, that the BIA applied the more generous well-founded fear standard to a petitioner's asylum claim. *Id.* Thus, we reject Rodriguez–Rivera's argument that the BIA applied the more stringent clear probability standard to his asylum claim.

2.

Rodriguez–Rivera next argues that the BIA erroneously concluded that his political neutrality could not constitute political opinion within the meaning of section 1101(a)(42)(A). Political neutrality clearly may constitute political opinion within the meaning of section 1101(a)(42)(A). *Arteaga*, 836 F.2d at 1231; *Lopez v. INS*, 775 F.2d 1015, 1016–17 (9th Cir.1985); *Bolanos–Hernandez*, 767 F.2d at 1286–87; *Argueta v. INS*, 759 F.2d 1395, 1397 (9th Cir.1985).

The BIA recognized that political neutrality could constitute political opinion within the meaning of section 1101(a)(42)(A). We find three statements within the BIA's opinion sufficient to support this conclusion. First, the BIA stated the appropriate grounds for qualifying for asylum under section 1101(a)(42)(A) and cited *Bolanos–Hernandez*, which expressly recognized that political neutrality could constitute political opinion within the meaning of section 1101(a)(42)(A). Second, the BIA expressly analyzed Rodriguez–Rivera's argument that his political neutrality

prevented him from joining the El Salvador Army. Third, the BIA concluded that Rodriguez–Rivera had not shown "a well-founded fear of persecution under section 208(a) as that standard is described in *Cardoza–Fonseca v. INS, supra,* based on any of the enumerated grounds within the Act for which asylum ... may be granted." Thus, we reject Rodriguez–Rivera's argument that the BIA failed to recognize that political neutrality could constitute political opinion within the meaning of section 1101(a)(42)(A).

3.

■ Finally, Rodriguez–Rivera argues that substantial evidence does not support the BIA's conclusion that he failed to establish a well-founded fear of persecution on account of his political neutrality. In support of his argument, he points to alleged persecution committed by the government of El Salvador and the guerrillas which supposedly establish his well-founded fear of persecution and argues that this persecution occurred on account of his political neutrality.

In *Bolanos–Hernandez,* we recognized that an alien seeking asylum on the basis of his political neutrality as a form of political opinion had to show (1) a well-founded fear of persecution, (2) persecution by the government or by a group which the government is unable to control, and (3) persecution on account of the petitioner's political belief. *See Bolanos–Hernandez,* 767 F.2d at 1284, 1288 (discussing 8 U.S.C. § 1253(h), but later indicating that essentially the same standard applies to asylum claims except that the standard for persecution is more generous with asylum claims). The INS contends that substantial evidence supports the BIA's conclusion that neither the alleged threats by the government nor by the guerrillas demonstrates a well-founded fear of persecution and that substantial evidence supports the BIA's conclusion that any persecution he might suffer would not be "on account of" his political opinion.

In addressing Rodriguez–Rivera's arguments we need only address whether substantial evidence supports the BIA's conclusion that Rodriguez–Rivera has failed to establish a well-founded fear of persecution from the government or the guerrillas. In analyzing this issue, we are guided by our statement in *Bolanos–Hernandez* that we should determine whether the group making the threat has the will or ability to carry it out. *See id.* at 1285. Moreover, where, as here, an alien has testified concerning specific guerrillas with whom he has dealt, and has testified that one guerrilla twice stated that "he" would kill the alien, and has testified that the guerrilla who made those threats is now dead, the BIA may consider the alien's testimony as to the specific guerrilla in determining the will or ability of that guerrilla to carry out a threat. This conclusion recognizes that the BIA should focus on the types of threats about which an alien testifies. Our cases do not require the BIA to ignore the alien's own testimony concerning the individual guerrillas and the specific threats that were made in determining whether the individual making the threats has the will or ability to carry out a threat. Of course, the BIA should not ignore general documentary evidence about the conduct of guerrillas, when presented, as a means of corroborating threats from individual guerrillas or groups of guerrillas. *See id.* at 1285–86. Such general documentary evidence need not specify the particular individual guerrillas or the specific groups.

■ Rodriguez–Rivera's evidence of governmental persecution consists of the following: (1) his recruitment by the Army, (2) his arrest for failing to carry his identification card, and (3) his knowledge of the murder of Penny's family members. Rodriguez–Rivera ignores, however, that the government's effort to recruit him into the military does not constitute political persecution. *Kaveh–Haghigy v. INS,* 783 F.2d 1321, 1323 (9th Cir.1986) (per curiam). For the same reasons that requiring military service does not constitute persecution, we also do not believe that governmental enforcement of a law apparently requiring all citizens to carry identification cards constitutes persecution on account of Rodriguez–Rivera's political opinion. Finally, we hold that substantial evidence supports the BIA's conclusion that the difficulties that

Penny and her family experienced were not in any way related to Rodriguez–Rivera. Penny was not a member of Rodriguez–Rivera's family or a member of any group to which he belonged. Knowledge of random violence does not substantiate a claim of persecution under the immigration laws. *Cf. Martinez–Romero v. INS*, 692 F.2d 595, 595–96 (9th Cir.1982) (reports of anarchy in El Salvador do not make out a claim of persecution).

In addition, we observe, as did the BIA, that Rodriguez–Rivera obtained a passport from the government, and his family continues to live in El Salvador unmolested. These factors are relevant in assessing a request for asylum or withholding of deportation and further undercut Rodriguez–Rivera's claims of a well-founded fear of governmental persecution. *See Espinoza–Martinez v. INS*, 754 F.2d 1536, 1540 (9th Cir.1985); *Chavez v. INS*, 723 F.2d 1431, 1434 (9th Cir.1984).

■ The evidence of guerrilla persecution consists of two threats that Salvador made against Rodriguez–Rivera. The test we are to apply, as discussed above, is found in *Bolanos–Hernandez.* It could be argued that the test was changed in *Arteaga* where we made certain broad statements which might indicate that the two threats directed at Rodriguez–Rivera would suffice to create a well-founded fear of persecution. *See Arteaga*, 836 F.2d at 1231–33. For example, we stated that "[a] specific verbal threat by the guerrillas directed at an individual whose identity and residence are known to the guerrillas is sufficient to create a well-founded fear." *Id.* at 1233. We read such broad statements, however, in conjunction with *Bolanos–Hernandez's* requirement that we examine the guerrillas' will or ability to carry out the threat, not simply whether threats were made. *See id.* Moreover, one should recognize that the entire discussion of the eligibility for asylum in *Arteaga* was dicta in that we had previously determined that the BIA had incorrectly applied the well-founded fear standard and had remanded to the BIA to consider the evidence in light of the more generous standard. *See id.* at 1230–31. Thus, in assessing Rodriguez–

Rivera's argument concerning his fear of persecution from the guerrillas, we are not guided by *Arteaga.* Instead, we rely on our analysis in *Bolanos–Hernandez.*

In support of its conclusion that Rodriguez–Rivera failed to establish a well-founded fear of persecution from the guerrillas, the BIA relied on the following: (1) that the guerrilla who made the threats is admittedly dead and there is no other evidence that the guerrillas are interested in Rodriguez–Rivera, (2) that Rodriguez–Rivera never reported the threats to the authorities, and (3) that Rodriguez–Rivera did not mention the encounters with the guerrillas in his asylum application.

We conclude that substantial evidence supports the BIA's determination that Rodriguez–Rivera failed to meet the objective prong of the test for a well-founded fear of guerrilla persecution. We believe that the BIA may consider Rodriguez–Rivera's unexplained failure to mention the guerrilla incidents in his asylum application and his failure to report the incident to authorities. These failures, however, would be more probative if there were a statement by the IJ concerning Rodriguez–Rivera's credibility. Nonetheless, the fact that Salvador is now dead is the most significant factor supporting the BIA's determination. There is no chance that Salvador will carry out his threats that "he" (Salvador) would kill Rodriguez–Rivera. Moreover, substantial evidence supports the finding that the guerrillas, including the two individuals who accompanied Salvador in making the second threat, do not have the will or ability to carry out the second threat. In affirming this finding, it is significant that Rodriguez–Rivera continued to live undisturbed from December 1981 until February 1982 and that there was no objective evidence indicating that the guerrillas were still interested in him. The BIA legitimately considered this two-month period as undermining Rodriguez–Rivera's claim that he had a well-founded fear of persecution. In sum, the BIA's conclusion 'based on the evidence [Rodriguez–Rivera] presented [in this case,] [was] substantially reasonable.' *Diaz–Escobar*, 782 F.2d at 1493.

## B.

Having concluded that substantial evidence supports the BIA's determination that Rodriguez–Rivera does not qualify for asylum, *a fortiori* the BIA's determination denying withholding of deportation was also correct. Accordingly, the petition for review is denied.

PETITION DENIED.