930 F.2d 920
 Unpublished Disposition
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
 
 David Sierra MORALES, Petitioner,
v.
IMMIGRATION & NATURALIZATION SERVICE, Respondent.
 No. 89-70437.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted April 8, 1991.
Decided April 15, 1991.
 Before WALLACE, Chief Judge, and GOODWIN and FLETCHER, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 The Board of Immigration Appeals (BIA) dismissed David Morales' appeal from an Immigration Judge's (IJ) order denying his applications for political asylum and the withholding of deportation to Honduras. Morales seeks review of that dismissal. We affirm.
 
 
 3
 Section 1158(a) of the Immigration and Nationality Act gives the Attorney General discretion to grant political asylum to any alien who is unable or unwilling to return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. Sec. 1101(a)(42). In contrast, Sec. 243(h) of the Act requires the Attorney General to withhold deportation of an alien who shows that " 'it is more likely than not that [he] would be subject to persecution' " in his home country. I.N.S. v. Cardoza-Fonseca, 480 U.S. 421, 423 (1987) (quoting I.N.S. v. Stevic, 467 U.S. 407, 429-430 (1984)).
 
 
 4
 Morales contends that the IJ applied the more stringent clear probability standard of Sec. 243(h) to his asylum claim. Even if this is true, however, reversal is not mandatory because "[i]t is the BIA that we review." Rodriguez-Rivera v. United States Dept. of Immigration and Nationalization, 848 F.2d 998, 1002 (9th Cir.1988).
 
 
 5
 Morales argues that the BIA might have committed the same error the IJ allegedly made. Assuming arguendo that this mere possibility would require reversal, it is clear that Morales' contention is groundless. Finding that Morales did not meet the less stringent well-founded fear standard, the BIA held that Morales failed a fortiori to meet his burden of proof under either section. The BIA thus expressly applied the more generous standard. Furthermore, the BIA's logic is sound. See id. at 1007 ("Having concluded that substantial evidence supports the BIA's determination that Rodriguez-Rivera does not qualify for asylum, a fortiori the BIA's determination denying withholding of deportation was also correct."). The major question in this appeal is whether substantial evidence supports the BIA's conclusion on Morales' alleged fear of persecution on account of political opinion. See id. at 1005.
 
 
 6
 An alien's fear of persecution is well-founded if it is genuine, reasonable and supported by " 'credible, direct, and specific evidence in the record ...' " Rebollo-Jovel v. I.N.S., 794 F.2d 441, 443 (9th Cir.1986) (quoting Diaz-Escobar v. I.N.S., 782 F.2d 1488, 1492 (9th Cir.1986)). The BIA did not question the genuineness of Morales' fear of persecution in his home country Honduras. Accordingly, our review is confined to the objective basis for his fear.
 
 
 7
 Morales testified that in Honduras in 1982 he had been a leader of two peasant organizations that the government had opposed. Such opposition, he claimed, manifested itself in the arrest and/or disappearance of some of the groups' leaders. He fled the country in 1983, after the death of his cousin, a high-ranking government official who he believed had protected him.
 
 
 8
 The BIA held that there was no objective basis for Morales' claim that the leaders of the peasant organizations had been persecuted. To support his contention, Morales provided the BIA with 23 articles from newspapers, magazines, and newsletters describing the sociopolitical crisis in Honduras. Many of the articles claim that the crisis was triggered by the Reagan administration's deployment of troops in that country for the purpose of increasing its pressure against the Sandinista regime in Nicaragua. The BIA determined that the articles provide information that is either too general or too ambiguous to support Morales' claim.
 
 
 9
 Out of those articles that discuss military efforts to suppress opposition movements organized by the populace, see, e.g., Philadelphia Inquirer, May 4, 1983, at ER 142, col. 3A (repeating the claim of a businessman from Honduras that "[s]ince, 1981 ... about 35 people--mostly labor leaders, workers and students--have disappeared and are presumed to be dead or in secret prisons ..."), one suggests that assassinations and disappearances happen only to key figures in the workers' movement, while "the peasant sector has been kept quiet with promises." Honduras Under Military Trusteeship, Latin Perspective, Vol. 1, No. 7, May 13, 1983, at ER 147, col. 1. Another expressly states, however, that leaders of peasant organizations have been kidnapped and murdered by the military. See The Case of Honduras, The New Republic, August 15 & 22, 1983, at ER 153, col. 1. Specifically, the article states that "[w]hen peasants began to organize and occupy land, the military--which had begun to acquire its own land--got tougher in its response, and in one notorious incident a dozen peasant leaders were killed." Id. The article goes on to say that "[t]here have been at least a dozen disappearances and killings this year, some of them widely believed to be the work of the D.N.I., the secret police.... Gregorio Amaya, the president of a peasants' union, was kidnapped from his home on March 29, the same night that at least three other union leaders were assassinated." Id. at col. 2.
 
 
 10
 Contrary to the BIA's statement, this last article--published in a reputable journal--provides information that is far from "ambiguous with regard to how peasant organizations have been treated by the government." We cannot agree with the BIA's conclusion, therefore, that Morales failed to provide credible, direct, and specific evidence to support his contention. Nevertheless, because Morales failed to provide an adequate basis for his claim of membership in persecuted peasant groups, we affirm the BIA's conclusion that Morales failed to meet his burden of proof under Secs. 1101(a)(42) and 243(h).
 
 
 11
 In his testimony, Morales identified the names and purposes of those organizations, as well as the number of members and the positions he held. He named the group that had been recognized by the government, claimed that both groups had been infiltrated by informants, and explained the danger faced by members. The BIA stated that this testimony "fails to reflect the type of knowledge that only a person who belonged to those organizations would have." Whether we agree or disagree with the BIA's assessment, we cannot say that it was unreasonable.
 
 
 12
 The knowledge reflected in Morales' assertions might well be widely known among peasants from his town in Honduras. The information he gave is not much more descriptive than that given in the numerous articles he provides as evidence of persecution against peasant groups. An account of specific incidents or plans of which it would seem only group members could have known--or that few outsiders could have credibly invented--would have allayed any concern that Morales' knowledge was not first-hand.
 
 
 13
 Furthermore, we have held that general documentary evidence, when presented to corroborate evidence pertaining to specific individuals alleged to have threatened an alien, need not specify those individuals or their groups. Rodriguez-Rivera, 848 F.2d at 1005. Under a broad reading of Rodriguez, Morales' general statements would likely suffice to corroborate other more specific evidence of his membership in the organizations. In light of the fact that Morales' statements were not offered to corroborate such evidence, however, the BIA's conclusion that Morales did not meet his burden of proof in this regard is "substantially reasonable." Diaz-Escobar v. I.N.S., 782 F.2d 1488, 1493 (9th Cir.1986).
 
 
 14
 Finally, because we agree with the BIA's conclusion that Morales' asylum and deportation claims were not undermined by errors in the transcript of his hearing, his due process claim must fail. See Magallanes-Damian v. I.N.S., 783 F.2d 931, 933 (9th Cir.1986); Roque-Carranza v. I.N.S., 778 F.2d 1373, 1374 (9th Cir.1985). The BIA's opinion evinces a thorough understanding of Morales' prayer for relief, notwithstanding the alleged "improper transcriptions of many statements" and improper translation of "campesinos" as "countrymen." Because Morales has failed to meet his burden of identifying the "many statements" that he alleges were improperly transcribed, we have no reason to question the BIA's judgment. With regard to the faulty translation of "campesino," the record shows that the BIA understood that Morales claimed to be a leader, as opposed to a mere member, of a peasant organization; and the BIA's reiteration of Morales' statement that "[l]eaders of the organizations particularly were in jeopardy when the government would intervene" indicates its appreciation of that distinction.
 
 
 15
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3