21 F.3d 1113
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Ali KAMALEDDIN,** Fatemeh Zokaei-Alamdari, Petitioners,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent.
 No. 92-70551.
 United States Court of Appeals, Ninth Circuit.
 Submitted Feb. 2, 1994.*
Decided April 4, 1994.
 
 Before: D.W. NELSON, REINHARDT, and BRUNETTI, Circuit Judges.
 
 
 1
 MEMORANDUM***
 
 
 2
 Fatemeh Zokaei-Alamdari ("Zokaei") petitions for review of a decision of the Board of Immigration Appeals denying her applications for political asylum and suspension of deportation. For the reasons stated below, we grant the petition and reverse and remand for further proceedings on both claims.
 
 
 3
 Zokaei is a thirty-five year old native and citizen of Iran. She has resided continuously in the United States since December 1982. In 1974, Zokaei married Ali Kamaleddin. Although Kamaleddin told her he was in the Iranian army, he was actually a member of the "Savak," the Shah's secret police. In 1975, the couple had a son, Reza. Kamaleddin subsequently went to the United States to study and, in 1979, the couple was divorced. In the meantime, the Shah was overthrown and the revolutionary government was installed in Iran. Shortly after the divorce, female officers of the new government's Revolutionary Guards put pressure on Zokaei to marry a disabled Iranian war veteran. ER, tab 4 at 950. Zokaei testified that she was able to rebuff such efforts temporarily, but claimed that it was only her departure from Iran that prevented her from being coerced into entering such a marriage. ER, tab 8 at 374. She testified that the authorities took her refusal to marry a veteran as evidence of her opposition to the Khomeini regime. Id. at 371. At about the same time that Zokaei began getting pressure to marry a disabled veteran, her brother was arrested and imprisoned for one month for distributing anti-government leaflets. Id. at 372.
 
 
 4
 In 1982, Zokaei's young son, who had just begun his formal schooling, got into trouble at school when he cursed Khomeini and then refused to take part in anti-American demonstrations. School officials cautioned Zokaei regarding her son's behavior, and, on one occasion, members of the Revolutionary Guard visited her at home and warned her that her son's activities were influencing other young pupils. She was told that both she and her son would be arrested if his behavior did not cease. See ER, tab 4 at 950-52 (Zokaei declaration).
 
 
 5
 Soon after these events, Zokaei appealed to her ex-husband for help. Kamaleddin returned from the United States, the couple was remarried, and Kamaleddin helped smuggle Zokaei and Reza out of Iran and into the United States. In 1986, after Kamaleddin had obtained immigrant status for Zokaei and Reza, the family travelled to the American Embassy in Turkey to obtain their visas and reentered the United States as immigrants. The couple again divorced in 1989.
 
 
 6
 Since arriving in 1982, Zokaei has learned to read and write as well as speak English, and she has been trained to be a hairdresser and cosmetologist.
 
 
 7
 Proceedings against Kamaleddin, Zokaei and Reza began in 1987. In an opinion dated February 1, 1991, the IJ found all three individuals deportable. The IJ determined that Kamaleddin was deportable because he had obtained permanent resident status by fraudulent means, and that, because Kamaleddin did not have legal status at the time he petitioned for immigrant status for Zokaei and Reza, they were also deportable. The IJ's determination that Zokaei was deportable thus was not based on a finding that Zokaei herself had participated in any fraud or misrepresentation. The IJ then denied Kamaleddin's claims for asylum, withholding of deportation, suspension of deportation, and voluntary departure, on grounds that the testimony of Kamaleddin was not credible, that he had attempted to defraud immigration authorities, and that he had participated in persecution himself as a member of Savak. Reza was denied asylum and withholding of deportation, but was granted suspension of deportation on grounds that he was "thoroughly and totally Americanized," ER, tab 9 at 29, and would face extreme hardship were he forced to return to Iran. The IJ denied Zokaei's claim for asylum on grounds that she lacked a well-founded fear of persecution in Iran, and he denied her claim to suspension of deportation, asserting that although she met the residency and good character requirement, deportation would not create extreme hardship for her. Id. ("[E]ven though I find that she satisfies all other requirements of the suspension statute, including the question of discretion, I cannot agree that she has presented sufficient evidence to demonstrate an extreme hardship to herself should she be expelled from this country."). The IJ, however, granted Zokaei voluntary departure.
 
 
 8
 On June 4, 1992, the BIA affirmed the decision of the IJ in an opinion which, though it purported to review the evidence de novo, the BIA's analysis largely mirrored that of the IJ. Zokaei now seeks relief in this court, contending that the BIA's denial of asylum was not supported by substantial evidence and that the BIA applied the wrong standard in analyzing her claim. Zokaei also claims that the BIA erred in denying her application for suspension of deportation.
 
 I. ASYLUM
 A. Standard of Review
 
 9
 Under 8 U.S.C. Sec. 1158(a), the Attorney General has discretion to grant an alien asylum if the alien is determined to be a "refugee." See 8 U.S.C. Sec. 1158(a) (1988). A refugee is defined as any person who is unable or unwilling to return to his or her country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C.A. Sec. 1101(a)(42)(A) (1993). The "well-founded fear" standard has both objective and subjective components. The subjective component may be satisfied by "an applicant's credible testimony that he genuinely fears persecution." Acewicz v. INS, 984 F.2d 1056, 1061 (9th Cir.1993) (citing Berroteran-Melendez v. INS, 955 F.2d 1251 (9th Cir.1992)). The objective component "requires a showing by 'credible, direct, and specific evidence' of facts supporting a reasonable belief of fear of persecution" on the relevant ground. Id. (quoting Rodriguez-Rivera v. INS, 848 F.2d 998, 1002 (9th Cir.1988) (per curiam)). The burden is on the applicant to meet this standard. See id.; 8 C.F.R. Sec. 208.5 (1990).
 
 
 10
 A determination that the petitioner is not eligible for asylum is reviewed under the "substantial evidence" standard. See INS v. Elias Zacarias, 112 S.Ct. 812, 815 (1992) (applying the substantial evidence standard to review the BIA's determination that an alien had not established a well-founded fear of persecution); Berroteran-Melendez v. INS, 955 F.2d 1251, 1255 (9th Cir.1992) (same); Estrada v. INS, 775 F.2d 1018 (9th Cir.1985) ("We review asylum decisions under a two-tier approach. The initial decision of whether the alien has met the refugee definition under 8 U.S.C. Sec. 1101(a)(42)(A) is reviewed under the substantial evidence standard test. The ultimate discretionary grant or denial of asylum, however, is reviewed for abuse of discretion."). Under this standard, we uphold the BIA's decision if, " 'based on the evidence presented, [it is] substantially reasonable.' " Id. (quoting Diaz-Escobar v. INS, 782 F.2d 1488, 1492 (9th Cir.1986)); accord Arriaga-Barrientos v. INS, 937 F.2d 411, 413 (9th Cir.1991). Although the BIA must state with "sufficient particularity" the reasons for its decision, see Castillo v. INS, 951 F.2d 1117, 1121 (9th Cir.1991), the court looks to the entire record to determine if substantial evidence justifies the BIA's decision, see Elias-Zacarias, 112 S.Ct. at 815. Because the burden of proof is on the petitioner to demonstrate eligibility for asylum, the reviewing court will reverse "only if the evidence presented ... was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed." Elias-Zacarias, 112 S.Ct. at 815.
 
 B. Analysis
 
 11
 Zokaei first claims that the BIA applied the wrong standard in denying her claim for asylum. Zokaei claims that the BIA articulated the correct "reasonable possibility" of persecution standard but argues that it applied the stricter "clear probability" standard when reviewing her case. Zokaei cites to the following passage from the BIA's decision in support of this claim:
 
 
 12
 In the opinion of the immigration judge, there is nothing in the record to indicate that the (sic) Ms. Zokaei was persecuted in Iran or that she would face persecution if she were to return to that country. We agree.
 
 
 13
 A.R. 20 (emphasis added). If this were the only indication of the standard applied by the BIA, Zokaei would have a valid claim. In other parts of its analysis, however, the BIA made clear that it was not applying the standard applicable to withholding of deportation. Thus, the BIA analyzed whether Zokaei's ex-husband's past affiliation with Savak provided a "basis for fear of prosecution," and the use of the phrase "basis for fear" indicates that the BIA was looking for evidence of possible persecution rather than evidence showing that persecution was inevitable or more probable than not. Similarly, when discussing the merits of Zokaei's withholding of deportation claim, the BIA reemphasized that because Zokaei had failed to meet the "lower burden" required for asylum, she necessarily had failed to meet the clear probability standard for eligibility for withholding. When the BIA's analysis of Zokaei's claim to asylum is viewed in its entirety, it appears that the BIA applied the correct standard.
 
 
 14
 Zokaei also argues that the BIA's denial of her asylum claim was not supported by substantial evidence. Zokaei claims that she has reason to fear persecution because Iranian officials perceive her as being opposed to the regime. She does not claim to have expressed anti-government opinions herself, but argues that a number of factors show that the government will impute such opinions to her should she be deported. In support of this argument, Zokaei emphasizes her refusal, despite pressure from authorities, to marry a disabled war veteran, as well as the visit to her home in 1982 by members of the Revolutionary Guard regarding her young son's anti-Khomeini stance. Zokaei also mentions the arrest and one month imprisonment of her brother in 1979, her ex-husband's past affiliation with Savak, and her family's illegal departure from Iran.
 
 
 15
 We note at the outset that although the BIA specified the grounds for its conclusion, its analysis of Zokaei's claims was deficient in a number of respects. Although the BIA mentioned the concern of school officials with Zokaei's son's behavior, it did not mention the visit of the Revolutionary Guards to Zokaei's house. It also failed to mention the arrest of Zokaei's brother and the implications of Zokaei's illegal departure from Iran. The BIA also cursorily dismissed the potential significance of the pressure on Zokaei to marry a disabled veteran, apparently missing entirely the thrust of Zokaei's claim--that, had she remained in Iran, she would have been put to the choice of marrying against her will or confirming the belief of the authorities that she was opposed to the regime.
 
 
 16
 Despite the errors and oversights in the BIA's analysis, we would uphold the BIA's decision if the record as a whole provided substantial evidence for the BIA's conclusion. We are convinced, however, that a careful reading of the record compels reversal.
 
 
 17
 A number of factors, though not in themselves sufficient to compel reversal, suggest that Zokaei may face a hostile reception were she to return to Iran. It is relevant though not dispositive, for example, that Zokaei's former husband was an officer in Savak, that her brother was arrested and imprisoned for anti-government leafletting, and that Zokaei herself departed from Iran clandestinely and illegally. The factors that clearly establish her eligibility for asylum, however, are the pressure brought to bear on her by the Revolutionary Guards on account of the activities of her son, and the dire predicament created by the efforts of the authorities to have her marry a wounded veteran. When properly credited, these factors establish that government censure was directed at her individually, and strongly suggest that the authorities may single her out for persecutorial treatment based on their belief that she holds political opinions contrary to those of the regime.
 
 
 18
 The response of Iranian authorities to the activities of Zokaei's young son at school provides considerable support for Zokaei's claim. In her declaration, Zokaei described the trouble at school as follows:
 
 
 19
 In 1981 my son was enrolled in school. In no time at all he began to be harassed by other children because they knew his father was in the United States and because he was in SAVAK. My son became angry and spoke out against Khomeini and refused to take part in rallies sponsored by the government. At first only the school complained about his behavior, but, in January 1982 Revolutionary Guards came to my house. The guards told me that my son was speaking out against Khomeini and the revolution and was speaking in support of the United States. I was told to have my son stop such activities. I was also told that Reza was also getting other children to participate in those anti-revolutionary activities.... I was told that if he didn't cease that both he and I would be arrested.
 
 
 20
 ER, tab 4 at 951 (Zokaei declaration). Zokaei reported that she subsequently received warnings from school officials that Reza was continuing his oppositional stance at school. Fearing that her life and that of her son were in danger, she contacted her ex-husband in the United States and he offered to help her flee Iran. ER, tab 9 at 17.
 
 
 21
 Zokaei also emphasized in her declaration that, prior to her departure from Iran and after her divorce from Kamaleddin, "female officers of the Revolutionary Guard would come to my house and request in strong terms that since I was single I should marry a crippled war veteran." ER, tab 4 at 950. In her testimony, Zokaei said that she was approached regarding such a marriage nearly every day, and was only able to avoid marrying a veteran by saying she was not yet ready to remarry. ER, tab 8 at 370-375.
 
 
 22
 Both the IJ and the BIA found that the pressure on Zokaei to marry a disabled veteran did not provide a basis for finding that Zokaei had the requisite fear of persecution. The IJ reasoned that Zokaei was able to fend off the coerced marriage by saying she "wasn't ready" and emphasized that Zokaei did not introduce any evidence showing that her refusal to marry would have been taken as evidence of her opposition to the regime. The BIA addressed the coerced marriage issue in two sentences, stating that "[e]ven if [Zokaei were forced to marry a disabled war veteran], Zokaei has failed to show how such a marriage would have been tantamount to persecution based upon ... political opinion." ER, tab 10 at 14.
 
 
 23
 Contrary to the findings of the IJ and BIA, the record makes clear that Zokaei did link the authorities' efforts to have her marry a disabled veteran to the possibility of politically motivated persecution. When asked what would have happened if she had refused to marry a veteran, Zokaei testified that "[t]hey would come back and say that, 'You are against Iran and your husband is in America, you like that place, America....' " ER, tab 8 at 371. When Zokaei subsequently explained that she would have been forced to marry a veteran had she remained in Iran, ER, tab 8 at 374, the clear implication was that, since the authorities already believed that she might be opposed to the regime, she could not afford to say "no"--she would have to consent to marriage to avoid the potentially disastrous consequences of being labeled an enemy of the regime. There can be no doubt that a government that coerces a woman to marry against her will on account of imputed political opinion has engaged in persecution within the meaning of 8 U.S.C. Sec. 1101(a)(42)(A). See, e.g., In re Acosta, 19 I & N Dec. 211, 222 (defining persecution to include "a threat to the life or freedom of, or the infliction of suffering or harm upon, those who differ in a way regarded as offensive") (citing Kovac v. INS, 407 F.2d 102, 107 (9th Cir.1969)).
 
 
 24
 We conclude that, when Zokaei's testimony concerning the threats from the Revolutionary Guard and her testimony concerning the pressure to marry a disabled veteran are properly credited, the record as a whole compels the conclusion that Zokaei faces a reasonable fear of persecution. Accordingly, we hold that Zokaei is eligible for asylum and we remand her claim to the BIA so that it can exercise its discretion under 8 U.S.C. Sec. 1158(a).
 
 II. SUSPENSION OF DEPORTATION
 A. Standard of Review
 
 25
 An alien found deportable may seek suspension of deportation pursuant to 8 U.S.C. Sec. 1254(a)(1). To be eligible, an alien must have been physically present in the United States for not less than seven years, must be a person of "good moral character," and deportation must result in "extreme hardship to the alien or to [her] spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence...." 8 U.S.C. Sec. 1254(a)(1). The applicant must satisfy the statutory eligibility requirements before discretion can be exercised. See, e.g., INS v. Rios-Pineda, 471 U.S. 444, 446 (1985).
 
 
 26
 Because the BIA found that Zokaei met the first two criteria for suspension of deportation, the only question for this court is whether the BIA erred when it found that Zokaei could not show "extreme hardship." This court reviews the BIA's findings regarding extreme hardship for abuse of discretion. Cerrillo-Perez v. INS, 809 F.2d 1419, 1421 (9th Cir.1987). Although the statute commits the definition of "extreme hardship" to the Attorney General, who has authority to define the term narrowly, see INS v. Wang, 450 U.S. 139, 144-45 (1981), the BIA must show that it has considered all relevant circumstances. Zavala-Bonilla v. INS, 730 F.2d 562, 567 (9th Cir.1984). "Failure to consider all of the factors which bear on extreme hardship is an abuse of the Board's discretion." Mejia-Carrillo v. INS, 656 F.2d 520, 522 (1981).
 
 B. Analysis
 
 27
 The INS first argues that Zokaei failed to preserve her claim for appeal. The INS contends that, because Zokaei did not mention the IJ's denial of the suspension of deportation claim in her notice of appeal filed with the BIA, and discussed the claim in her brief to the BIA in a single sentence, Zokaei waived her right to raise the issues she now sets forth in her briefs to this court.
 
 
 28
 Although the notice of appeal was defective, it was filed in pro per by Zokaei's ex-husband Kamaleddin, and, in the notice, petitioners explained that they were without an attorney (their attorney had moved). In the notice, the petitioners expressly requested that the BIA allow them to include additional claims after obtaining a new attorney. By the time the brief was filed, the petitioners had obtained counsel, and counsel explicitly claimed in the brief that petitioners were "eligible for suspension of deportation under the same analysis applied to their son, Reza who was granted suspension of deportation [by the IJ]." AR at 92. Although it is regrettable that petitioners' new counsel raised the claim in this cursory fashion, any defects in the notice of appeal and brief were rendered moot by the BIA's decision to address the suspension of deportation claim in full. See Sagermark v. INS, 767 F.2d 645, 648 (9th Cir.1985), cert. denied, 476 U.S. 1171 (1986) (holding that, where the BIA addresses an issue in sufficient detail, this court has jurisdiction to review that issue even if it was not properly presented to the BIA--where the BIA fully addresses a claim, "the policy concerns underlying the exhaustion requirement ... have been satisfied."). Accordingly, the INS's contention that Zokaei waived her right to raise the suspension of deportation issue is without merit.
 
 
 29
 Zokaei's contention on the merits is that the BIA abused its discretion by failing to give meaningful consideration to the hardship that she would face were she separated from her only child, and for failing to give any consideration at all to the hardship that her deportation would create for her son. We agree.
 
 
 30
 It is well-established in our case law that the BIA should give considerable, if not predominant, weight to close family ties when evaluating whether a claimant qualifies for suspension of deportation. See, e.g., Mejia-Carrillo v. INS, 656 F.2d 520, 522 (9th Cir.1981) (holding that the BIA gave insufficient weight to the implications of the possible separation of applicant from her 17-year old permanent resident son, and noting that "[t]he most important single factor [to be considered when evaluating hardship] may be the separation of the alien from family living in the United States"). Here, it is undisputed that, if deported, Zokaei likely will be separated from her teenage son Reza. Although there was testimony before the IJ that Reza does not currently reside with Zokaei and does not always get along with her, this evidence is not decisive, and, in any case, was never considered by the IJ or BIA. Even assuming that the relationship between Zokaei and her teenage son has been strained by the tensions of adjusting to life in a new society, Reza is Zokaei's only child, and has been with her in the United States since she first fled Iran in 1982. At a minimum, the BIA should have analyzed the effects of deportation on the mother-son relationship.
 
 
 31
 Anomalously, neither the IJ nor the BIA addressed in any detail the implications of the likely separation. The IJ's only reference to Zokaei's relationship with Reza was that "with regard to family ties, Fatemeh's husband and son reside in the U.S." ER, tab 9 at 28. Similarly, the BIA's only reference was its dismissive comment that "[a]lthough her teenage son's deportation has been suspended, entitling him to lawful permanent residence in the United States, Ms. Zokaei's family ties are otherwise to Iran." ER, tab 10 at 16. This summary treatment of the hardship to Zokaei of being separated from her only child requires that we remand the case in order that the issue be given proper consideration. See, e.g., Zavala-Bonilla, 730 F.2d at 568 (holding that the BIA's failure to consider factors pertinent to the hardship determination is abuse of discretion); Mejia-Carrillo, 656 F.2d at 522 (holding that BIA's failure to "give reasons which show that it has properly considered the facts which bear on its decision" is an abuse of discretion).
 
 
 32
 Even more significantly, neither the IJ nor the BIA so much as considered the hardship that deportation of Zokaei might occasion for Reza. Because Reza was granted permanent resident status by the IJ's 1991 decision, both the IJ and BIA were required by statute to give consideration to the potential hardship to Reza when evaluating his mother's suspension of deportation claim. See 8 U.S.C. Sec. 1254(a)(1) (1988); see also Cerrillo-Perez v. INS, 809 F.2d at 1422-27 (remanding because the BIA failed to consider the hardship that would be faced by the applicants' citizen children were those children to remain in the United States following their parents' deportation); Contreras-Buenfil v. INS, 712 F.2d 401, 403 (9th Cir.1983) (remanding because the BIA failed to consider the hardship that applicant's separation from citizen infant daughter would cause to the daughter).
 
 
 33
 Zokaei fled Iran for the United States, bringing along her only child, Reza. Twelve years later, after her son has been granted permanent resident status, Zokaei is in danger of being forcibly deported by the INS without any meaningful consideration of the hardship that would be created if Zokaei were to be separated from her son. Accordingly, we reverse and remand in order that the BIA carefully consider whether such separation would constitute extreme hardship to Zokaei or Reza, or to both.
 
 CONCLUSION
 
 34
 We reverse the BIA's denials of asylum and suspension of deportation, and remand the case so that the BIA can exercise its discretion on the asylum claim and reconsider whether separating Zokaei and her son would result in extreme hardship for either party.
 
 
 35
 REVERSED and REMANDED.
 
 
 36
 BRUNETTI, Circuit Judge, concurring in part and dissenting in part:
 
 
 37
 I concur in the memorandum's reversal of the BIA determination regarding suspension of deportation. I must dissent, however, from the memorandum's judgment of reversal on appellant's asylum claim. Considering the record as a whole, the BIA could reasonably conclude that the requisite fear of political persecution did not exist. Reversal is thus inappropriate. INS v. Elias-Zacarias, 112 S.Ct. 812, 815 (1992).
 
 
 
 *
 The panel unanimously finds this case suitable for decision without oral argument. Fed.R.App.P. 34(a) and 9th Cir.R. 34-4
 
 
 **
 On February 18, 1993, this court dismissed the appeal of Ali Kamaleddin for failure to prosecute under 9th Cir.R. 42-1
 
 
 ***
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3